

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-07-00103-CV

_____

THE PEOPLES GAS, LIGHT, AND COKE COMPANY, Appellant

V.

HARRISON CENTRAL APPRAISAL DISTRICT, Appellee

On Appeal from the 71st Judicial District Court
Harrison County, Texas
Trial Court No. 05-0381

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

## OPINION

The large amount of natural gas ordinarily stored under Harrison County has great value. The Harrison Central Appraisal District (the District) has acted to assess a large ad valorem tax bill against a portion of that gas—gas allocable to the account of Peoples Gas, Light, and Coke Company (Peoples). From a judgment favoring the District, Peoples appeals.

The gas in question is stored in a large, depleted natural gas field now used as a natural gas storage facility—the North Lansing facility—part of the interstate pipeline system operated by Natural Gas Pipeline Company of America (Pipeline). Peoples is a distribution company that purchases natural gas from suppliers and delivers it to users in Chicago, Illinois. Pipeline, not a party to this matter, operates the interstate pipeline system pursuant to regulations promulgated by the Federal Energy Regulatory Commission (the Commission). Peoples buys natural gas already on the interstate pipeline system owned and operated by Pipeline. Pipeline representatives testifying at trial emphasize that there are many storage facilities associated with its pipeline and that the pipeline is operated "in the aggregate." In other words, Pipeline's storing and transporting gas does not use any particular storage field exclusively.

Pipeline pays ad valorem taxes on what is called "cushion gas" in North Lansing, the significant volume of natural gas that remains in the storage facility and provides the necessary pressure and balance to facilitate the safe, efficient operation of the pipeline. Beginning in 1999, the District allocated to Peoples a portion of the "working" natural gas balance—the volume of gas

(above the "cushion") that is transported and delivered to pipeline customers—and assessed taxes on the value of that portion of the natural gas stored at North Lansing. Peoples successfully challenged the assessment and, on advice of its appraisal consultant firm, the District removed Peoples from the tax rolls. The same thing happened in 2000.

For tax years 2003–2005, the District again attempted to assess taxes against Peoples on a portion of the gas stored at North Lansing. This time, on advice from a new consultant firm, the District refused to remove Peoples from the tax rolls. Instead, the District assessed Peoples' portion of the gas at North Lansing, for those years, at values exceeding nine million, forty million, and forty-three million dollars, respectively. Those tax years and tax levies are at issue in this case.

The gas volume figures allocable to Peoples are based on Pipeline's records.[1] Pipeline compares the total contractual balance for all the NSS[2] shippers that have contracts on Pipeline's Gulf Coast Leg to the "working" natural gas balance at North Lansing at the end of the year. This yields a percentage that is multiplied by each shipper's NSS contractual balance on the Gulf Coast Leg of the pipeline at the end of the year to arrive at the allocation it attributes to a customer.

---

[1]Pipeline's representative explained that its allocation methods were not for the purpose of determining ownership. It merely did what it was asked to do for the courts to decide the issue of ownership.

[2]Pursuant to Commission tariffs, Pipeline offers several types of contracts to shippers on its pipeline system. Most common are the "NSS" and "DSS" contracts. NSS storage requires a customer such as Peoples to request or nominate a withdrawal to get delivery on a date certain. DSS storage service, on the other hand, allows for no-notice delivery.

3

The trial court ruled that the District has the authority to assess the ad valorem taxes for the years in question on the gas it allocated to Peoples. We review de novo the trial court's conclusions of law determining each question of law independently. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1999). We review the trial court's findings of fact for legal and factual sufficiency, as we do with jury findings. *See Ashcraft v. Lookadoo*, 952 S.W.2d 907, 910 (Tex. App.—Dallas 1997, pet. denied).

Our analysis leads us, through the following logical steps, to conclude that taxing this gas infringes the Commerce Clause:

> (1) Peoples owns this gas for ad valorem tax purposes.
> (2) The Commerce Clause shields this gas from ad valorem taxation.
>     (A) This gas is in interstate commerce.
>     (B) This storage does not remove this gas from interstate commerce.
>     (C) The District cannot tax this gas.

For these reasons, we reverse the judgment of the trial court and render judgment that assessing these ad valorem property taxes for these years was improper.

*(1)    Peoples Owns this Gas for Ad Valorem Tax Purposes*

The District and Peoples agree that, under the Commission's regulations, Pipeline does not own the gas in its pipeline system. Peoples contends that it does not own, for ad valorem tax purposes, any amount of the massive volume of natural gas lying beneath Harrison County; the District responds that someone must own the gas, and, since Pipeline certainly does not, Peoples *must* be the taxable owner of the portion of the gas allocable to its account.

4

"Property taxes are the personal obligation of the person who owns or acquires the property on January 1 of the year for which the tax is imposed." TEX. TAX CODE ANN. § 32.07(a) (Vernon 2008). The Texas Tax Code does not define "own" or "owner" for purposes of assessing ad valorem taxes. Texas courts have generally defined taxable "owner" as the individual or entity holding legal title to the property or holding an equitable right to obtain legal title. *See Childress County v. State*, 127 Tex. 343, 92 S.W.2d 1011, 1015 (1936); *Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 833, 840 (Tex. App.—Austin 2004, no pet.); *Comerica Acceptance Corp. v. Dallas Cent. Appraisal Dist.*, 52 S.W.3d 495, 497 (Tex. App.—Dallas 2001, pet. denied). If an individual or entity does not hold perfect legal title, however, that individual or entity may still be considered the taxable owner of property "if he is the record owner, or is vested with the apparent legal title, or is in possession thereof, coupled with such claims and evidences of ownership as will justify the assumption that he is the owner thereof." *Childress County*, 92 S.W.2d at 1015; *Signature Flight Support Corp.*, 140 S.W.3d at 840. The term "owner" has no fixed legal meaning:

> The meaning of the term owner is not the same under all circumstances. It is not a technical term or word at all, but one of wide application in various connections. In all instances its meaning must be ascertained from the context and subject matter.

*Realty Trust Co. v. Craddock*, 131 Tex. 88, 112 S.W.2d 440, 443 (1938); *see Signature Flight Support Corp.*, 140 S.W.3d at 839. That said, we examine the "context and subject matter" here to determine whether Peoples owns the gas in question.

We begin with a short explanation of the highly regulated natural gas transportation and storage system and the dealings between Pipeline and its customers, including Peoples. The Commission restructured the natural gas transport and storage industry in 1992. This restructuring created a system of commercial rights for the pipeline customer that was separate from the physical operation of the pipeline system. Buyers and sellers conduct transactions at commercial points—"paper points" or imaginary points—along the pipeline at which a purchase may be completed, points that do not necessarily reflect the physical location of the gas purchased. Pursuant to this restructuring and to facilitate purchase transactions, Pipeline established geographical zones, such as the South Texas zone, the "TEX-OK" zone, and the Iowa-Illinois zone, which help identify the distance the gas is transported from the point at which it was injected into the pipeline system.

Applying the *Comerica*/*Travis County* test, we conclude Peoples is the owner for ad valorem taxation purposes. As the parties agree, Pipeline has complete control of the physical operation of the pipeline system. Pipeline decides where and when the natural gas is stored. There is no physical connection between a Pipeline customer's storage account balance and physical volumes at any particular storage facility. The District acknowledges that Pipeline's accounting methods are completely divorced from the physical reality of the natural gas location. Pipeline's customers purchase volumes of natural gas at what the parties refer to as a "paper" pooling point after which time, Peoples emphasizes, the purchaser retains no control to direct the physical movement of the

6

natural gas purchased. Peoples also emphasizes that Pipeline's storage fields are operated on an aggregated basis. That is, none of its services are specifically linked to any particular storage field.

Relevant documents show that Peoples purchased natural gas and paid for its transportation to the Iowa-Illinois zone. Of course, the fungible and ethereal nature of natural gas makes it impossible to ascertain the physical location of a given allocated portion of natural gas at any moment. Peoples contends that this documentary evidence in the form of Commission-approved agreements between Peoples and Pipeline suggests that Peoples' allocation of natural gas is "contractually" located in the Iowa-Illinois zone. Obviously, Pipeline cannot identify particular volumes of gas as belonging to a particular customer when physically transporting or storing natural gas.

Consistent with Commission regulations, Pipeline is in full custody, control, and possession of the natural gas within the pipeline system. Only Pipeline can direct the physical movement of the gas once it is placed in the pipeline; and, even after a purchase of gas at a paper pooling point, the purchaser obtains no control over the physical movement of the volume of natural gas purchased. Peoples has no legal right to the natural gas located at North Lansing; it cannot specifically request gas from that facility and could not merely back a truck up to the facility and remove any amount of natural gas. Nor is there any indication that it could do any such thing in Illinois. Peoples emphasizes that it owns merely contractual rights to physically receive natural gas in Chicago and that its purchases from Pipeline call for contractual storage in the Iowa-Illinois zone.

7

Nonetheless, by regulation, ownership rights could not be transferred to Pipeline. That said, according to the District, legal title must lie with Peoples. No doubt gas is stored beneath Harrison County; there must be an owner of that gas for tax purposes. Considering the nature of the product at issue here, the nature of the pipeline in which customers' fungible goods must be commingled, and the highly regulated industry in which Pipeline and Peoples conduct their business and which prohibits Pipeline from having ownership rights in the gas but requires that it maintain physical control of the natural gas, we conclude the trial court correctly decided that, for tax purposes, Peoples owns an allocation of the natural gas stored in Harrison County.[3]

[3]Last year, the Kansas Supreme Court decided a case similar to the instant case. *See In the Matter of the Appeal of the Director of Prop. Valuation*, 284 Kan. 592, 161 P.3d 755 (2007). In that case, several non-Kansas entities (municipal utilities, natural gas marketing company, and public utilities) had contracted for gas storage or deferred delivery with an interstate pipeline that maintained storage facilities in Kansas. *Id.* The parties stipulated that none of the entities had facilities within Kansas or sold, traded, or delivered natural gas anywhere in Kansas. *Id.* at 594. In Kansas, a public utility's property is not exempt from ad valorem taxes. The taxing entity argued that non-Kansas companies were public utilities within the following definition: "that own, control, and hold for resale stored natural gas in an underground formation in this state." *Id.* at 597. Based on the legal and contractual relationship between the pipeline and its customers established by Commission-approved tariffs, the Kansas Supreme Court concluded the entities were not public utilities because they did not "control" and "hold for resale" the stored natural gas. *Id.* at 606. With that, the non-Kansas companies' allocations were exempt from ad valorem taxes. It did, however, touch on the ownership aspect of the "public utility" definition:

> There is no serious dispute that the Taxpayers own (or at least hold contractual rights to) storage balances of natural gas contained in underground formations in the state. Nevertheless, whether the Taxpayers actually control and hold the natural gas is doubtful. It is undisputed that tariffs issued by the . . . Commission . . . establish that control and possession of natural gas delivered to interstate pipelines for transportation and storage is vested in the pipelines until the gas is redelivered to their customers. It is also undisputed that the interstate pipelines cannot track and

*(2)      The Commerce Clause Shields this Gas from Ad Valorem Taxation*

Peoples argues that, even if it could be said that it is the taxable owner in this matter, the Commerce Clause shields it from the District's assessment since the natural gas is in interstate commerce and since the tax cannot pass the test that would permit the District to assess such a tax on this property.  We agree.

The Commerce Clause grants Congress the power to regulate interstate commerce.  U.S. CONST. art. I, § 8, cl. 3.  Congress protects interstate business activity by restricting state regulation of interstate commerce.[4]  *See Marathon Ashland Petroleum, L.L.C. v. Galveston Cent. Appraisal Dist.*, 236 S.W.3d 335, 337–38 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

*(a)      This Gas Is in Interstate Commerce*

Traditionally, the United States Supreme Court has identified three ways in which goods can enter the stream of interstate commerce:  (1) the goods have been shipped, (2) the goods have been placed with a common carrier, or (3) the goods have started a continuous route or journey into

---

account for discrete packages or molecules of natural gas delivered for storage.  As the Supreme Court said in *Central Illinois*, under federal regulations the pipeline customers have "little or no control over where the severed natural gas is stored or for how long."

*Id.* at 603.  Our conclusion on the ownership issue is consistent with the Kansas Supreme Court's conclusion.

[4]Congress has granted the Commission exclusive jurisdiction to regulate the natural gas industry through the Natural Gas Act (NGA).  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988).

9

interstate commerce. *See Coe v. Errol*, 116 U.S. 517, 527 (1886); *Marathon Ashland Petroleum, L.L.C.*, 236 S.W.3d at 338. The goods become a part of interstate commerce when their movement demonstrates that the goods have started and are bound for another state. *See Hughes Bros. Timber Co. v. Minnesota*, 272 U.S. 469, 476 (1926). Goods are not a part of interstate commerce when the record shows only preparation or intent to send those goods out of state. *See id.*; *Marathon Ashland Petroleum, L.L.C.*, 236 S.W.3d at 340–41.

Here, it is apparent that the natural gas has been placed with a common carrier, Pipeline. Unlike the taxpayer in *Marathon Ashland Petroleum, L.L.C.*, Peoples does not maintain any control over the physical movement of the gas. Moreover, that common carrier is an interstate pipeline specifically governed by the Commission. There is little dispute that the natural gas in the *pipeline* is in interstate commerce. A critical question is whether the gas in North Lansing storage is similarly in interstate commerce.

*(b)     This Storage Does Not Remove this Gas from Interstate Commerce*

The District takes the position that, although an extremely small portion of the natural gas (that portion actually moving in the pipeline) is actually in interstate commerce, the rest of the natural gas is stored and therefore subject to local taxation wherever it is located. More specifically, the District argues that the fact that the portion of natural gas allocated to Peoples here is not actually moving in the pipeline and is, rather, stored beneath Harrison County takes the gas outside interstate

10

commerce, leaving it subject to taxation as a part of the mass of property within the State of Texas. *See Coe*, 116 U.S at 527; *Marathon Ashland Petroleum, L.L.C.*, 236 S.W.3d at 338.

We conclude this contention fails in the face of two areas of the law: authorities determining the effect of transportation stoppage on whether a product is in interstate commerce and authorities more specifically addressing storage of natural gas.

First, we look to the line of cases examining generally the circumstances surrounding the stoppage of products that have been injected into the stream of interstate commerce and determining whether a stoppage in a jurisdiction would subject the goods to local taxation. *See Indep. Warehouses, Inc. v. Scheele*, 331 U.S. 70, 73 (1947); *see also Virginia Indonesia Co. v. Harris County Appraisal Dist.*, 910 S.W.2d 905, 912–13 (Tex. 1995).[5] When there is a break in the interstate transit, the property may come to rest within a state and become subject to the power of the state to impose a nondiscriminatory property tax. *Indep. Warehouses, Inc.*, 331 at 72–73. The crucial question in determining whether the state may exert its taxing power is whether there is "continuity of transit." *Id.* at 73 (citing *Carson Petroleum Co. v. Vial*, 279 U.S. 95, 101 (1929)). The United States Supreme Court explained the concept:

> If the interstate movement has begun, it may be regarded as continuing, so as to maintain the immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and

---

[5]In *Virginia Indonesia Company*, the Texas Supreme Court determined whether the Import-Export Clause would permit imposition of an ad valorem tax. Similar considerations are involved when determining the "continuity of transit" for purposes of the Commerce Clause. *See* 910 S.W.2d at 912.

11

convenience in the course of the movement. . . . Formalities, such as the forms of billing, and mere changes in the method of transportation do not affect the continuity of the transit. The question is always one of substance, and in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied. . . .

*Id.* (quoting *Minnesota v. Blasius*, 290 U.S. 1, 9–10 (1933)). We must look at the facts of each case and will consider the owner's intention, the owner's ability to change destination, the agency or method of transportation, the actual continuity of the journey, and the purpose of the interruption. *See Champlain Realty Co. v. Town of Battleboro*, 260 U.S. 366, 377 (1922).

The character of the shipment in such a case depends on the circumstances, including what the owner has done to prepare for the journey and to carry it out. *Virginia Indonesia Co.*, 910 S.W.2d at 912–13. For instance, when the stoppage of property in interstate commerce is necessary for the safety and convenience of the goods, we do not consider the continuity of transit broken. *Indep. Warehouses, Inc.*, 331 U.S. at 73. On the other hand, if the stoppage is attributable to the business purpose of the owner, then we deem the continuity of transit terminated and the goods are subject to tax in the jurisdiction of the stoppage. *Virginia Indonesia Co.*, 910 S.W.2d at 912. Put another way,

[w]here property has come to rest within a State, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the State, or for shipment elsewhere, as his interest dictates, it is deemed to be a part of the general mass of property within the State and is thus subject to its taxing power.

*Indep. Warehouses, Inc.*, 331 U.S. at 73.

12

In the instant case, the record shows and the law requires that Peoples has no control over the physical operations of the pipeline. Control lies solely with Pipeline. Since Peoples has no control over where that natural gas is stored and how much is stored at any given location, we cannot say that Peoples made the decision to store gas at North Lansing in order to serve its business purpose. Simply put, it made no decision at all regarding the physical location of the stored natural gas.

The District contends Peoples benefits from the storage at North Lansing since it can buy gas at a cheaper rate in the summer months and store it for later use in the winter months when the demand in the Chicago area increases dramatically. It may well be the case that the advent of a pipeline system that will allow for storage of a significant amount of natural gas is beneficial to local distributing companies generally. Indeed, such a system would seem to be beneficial to all. Such a benefit, however, does not alter the fact that Peoples, while benefitting from a storage system generally, makes no decision to store the natural gas at North Lansing specifically. The record shows that the contracts between Peoples and Pipeline do not specify that the gas would be located in Texas. In fact, those agreements provide for "contractual" storage in Iowa and Illinois. The truth is, Pipeline operates its system without regard to the physical reality of identifying a specific storage facility at which any customer's volume of natural gas will be physically stored. Rather, Pipeline operates the pipeline on an "aggregate" basis in which all the storage facilities serve the pipeline as needed to operate efficiently and effectively. With these facts in mind, we conclude that the

13

stoppage of natural gas in North Lansing does not serve the business purpose of Peoples. To the contrary, Peoples has no control over where the natural gas is stored, and we cannot say that the stoppage in Harrison County serves a business purpose as contemplated by the cases dealing with the continuity of transit of goods in interstate commerce.

Second, we examine law specifically concerning the storage of natural gas. Commission regulations provide some guidance as to whether storage would take the natural gas out of the stream of interstate commerce: "Transportation includes storage, exchange, backhaul, displacement, or other methods of transportation." 18 C.F.R. § 284.1(a). By regulation, then, at least some storage is considered a part of the transportation process. Therefore, storage can be a part of *interstate* transportation. Storage in North Lansing, then, as a matter of regulatory definition, would not necessarily take the natural gas out of the stream of interstate commerce.

Indeed, the United States Supreme Court has spoken on this issue:

> Petitioners argued below that Storage was not a natural gas company within the meaning of the NGA, contending that the storage of gas constitutes neither the transportation nor the sale of gas in interstate commerce. Both courts below rejected this argument . . . reasoning that "transportation" includes storage. "Underground gas storage facilities are a necessary and integral part of the operation of piping gas from the area of production to the area of consumption."

*Schneidewind*, 485 U.S. at 295 n.1 (quoting *Columbia Gas Transmission Corp. v. Exclusive Gas Storage Easement*, 776 F.2d 125, 129 (6th Cir. 1985)); *see also Michigan-Wisconsin Pipe Line Co. v. Calvert*, 347 U.S. 157, 166–68 (1954) (evaluating Texas tax on "gathering" gas in context of interstate pipeline, characterizing situation and "so closely related to interstate transportation as to

14

be practically a part of it," and concluding that the tax in that situation violated Commerce Clause). This storage of this natural gas in North Lansing does not take the gas out of interstate commerce. To conclude otherwise would be to segregate, from the pipeline itself, a function deemed "necessary and integral" to the pipeline. We will not do so and, instead, conclude that this storage does not take this natural gas out of the stream of interstate commerce it entered by injection into an interstate pipeline. The natural gas allocated to Peoples is in the stream of interstate commerce, and this storage does not remove it from interstate commerce.

*(c)     The District Cannot Tax this Gas*

It remains possible that the District could still have the authority to tax the portion of natural gas allocated to Peoples, despite the fact that the natural gas has been injected into and remains within the stream of interstate commerce. A state tax does not violate the Commerce Clause if it (1) is applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state. *See Vinmar v. Harris County Appraisal Dist.*, 947 S.W.2d 554, 555 (Tex. 1997) (citing *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977)); *Diamond Shamrock Ref. and Mktg. Co. v. Nueces County Appraisal. Dist.*, 876 S.W.2d 298 (Tex. 1994); *Rylander v. 3 Beall Bros. 3, Inc.*, 2 S.W.3d 562, 570 (Tex. App.—Austin 1999, pet. denied). If a tax does not satisfy this test, called the *Complete Auto* test, the Commerce Clause prohibits the tax. *See Harris County Appraisal Dist. v. Transamerica Container Leasing, Inc.*, 920 S.W.2d 678, 682 (Tex.

15

App.—Houston [1st Dist.] 1995, writ denied). The second and third parts of the *Complete Auto* analysis, which require fair apportionment and nondiscrimination, prohibit taxes that pass an unfair share of the tax burden onto interstate commerce. *Quill Corp. v. N.D.*, 504 U.S. 298, 313 (1992). The first and fourth prongs, which require a substantial nexus and a relationship between the tax and state-provided services, limit the reach of state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce. *Id.*

The Commerce Clause requires "some definite link, some minimum connection,[6] between a state and the person, property, or transaction it seeks to tax." *Allied-Signal, Inc. v. Director, Division of Tax*, 504 U.S. 768, 777 (1992) (quoting *Miller Bros. v. Maryland*, 347 U.S. 340, 344–45 (1954)); *3 Beall Bros. 3, Inc.*, 2 S.W.3d at 570. The Commerce Clause requirement of a substantial nexus with the taxing state is satisfied by the taxpayer's physical presence in the state. *3 Beall Bros. 3, Inc.*, 2 S.W.3d at 570; *Lawrence Indus., Inc. v. Sharp*, 890 S.W.2d 886, 892–93 (Tex. App.—Austin 1994, writ denied); *see also Quill Corp.*, 504 U.S. at 312–14.

The record demonstrates that Peoples maintains no office in Texas. Nor does it have any employees, representatives, or physical facilities in the State. The physical facilities in Harrison

---

[6]The "substantial nexus" requirement is not, like due process' "minimum contacts" requirement, a proxy for notice, but rather a means for limiting state burdens on interstate commerce. *Quill Corp.*, 504 U.S. at 313. Accordingly, an entity may have the "minimum contacts" with a taxing state as required by the Due Process Clause, and yet lack the "substantial nexus" with that state as required by the Commerce Clause. *Id.*

16

County belong to Pipeline, as does the decision to use the North Lansing facility. Further, there is no evidence that any of the natural gas Peoples has purchased is delivered to any customer in Texas.

If we were to look strictly at the generic act of storing gas in a reservoir in Harrison County, it might appear that such an activity would have a substantial nexus with the State. We note again that, as required by the Commission regulations, Pipeline—not Peoples—directs that activity, and we are to consider not whether Pipeline's activities have a substantial nexus with the State, but whether Peoples' activities do. Peoples engages in the purchase and delivery of natural gas to its customers in Chicago. Its only connection in this respect to Texas is through the structure and location of Pipeline's pipeline and Pipeline's decision to store a significant amount of natural gas in North Lansing. Such a connection is too tenuous to subject Peoples to ad valorem taxation in Texas.[7]

The District contends the nexus lies between the natural gas and the State. The natural gas, it argues, comes from Texas and is, thus, substantially connected to the State such that the State should be allowed to tax it. The record suggests that much of the gas is Texas-produced.

---

[7]We also note our sister court's opinion in *Rylander v. Bandag Licensing Corp.*, 18 S.W.3d 296 (Tex. App.—Austin 2000, pet. denied). In *Bandag Licensing Corp.*, the Austin court suggests that "when the corporation conducts its activity solely through interstate commerce and lacks any physical presence in the state, no sufficient nexus exists to permit the state to assess tax." *Id.* at 300. That connection, along with the facts that the corporation's only activity was the "passive possession of a license to do business in Texas" and that the corporation had no physical presence in Texas, led the court to conclude that the Commerce Clause prohibited the imposition of a state tax in that situation.

Nevertheless, we do not have specific volumes of that production, nor could we ever know the location from which Peoples' allocation originated.

We conclude that, despite the fact that Peoples owns some of the natural gas on the system and thus under Harrison County, the storage of natural gas at the North Lansing field is an insufficient nexus when we consider the particular, unique circumstances at hand and the complex relationships among the parties involved. We find insufficient nexus between Texas and the entity, property, or transaction to be taxed. That said, the District's tax fails to satisfy the first prong of the *Complete Auto* test and, therefore, violates the Commerce Clause.

Moving to other parts of the test, we look at the relation between Peoples and services provided in Harrison County. Under the Commerce Clause, the measure of the tax must be reasonably related to the extent of the taxpayer's presence or activities within the taxing state and to the taxpayer's consequent enjoyment of the opportunities which the state has afforded. *3 Beall Bros. 3, Inc.*, 2 S.W.3d at 571. Even though fire and police services may not be invoked, protection conferred by these "along with the usual and usually forgotten advantages conferred by the state's maintenance of a civilized society are justifications enough for the imposition of a tax." *See Transamerica Container*, 920 S.W.2d at 683. The District presented substantial evidence of services provided within the county. While we do not doubt the value of those services, we note, again, that services such as law enforcement and the fire department would serve the North Lansing

18

facility itself, and the facility undoubtedly belongs to Pipeline, which does pay ad valorem taxes on both the "cushion" gas it maintains in the facility and the physical plant of the facility itself.

Having found that the District's tax on Peoples' gas fails to meet, at least, the first and fourth prongs of the *Complete Auto* test, we conclude that assessment of ad valorem taxes, on these facts, runs afoul of the Commerce Clause.

We reverse the trial court's judgment and render judgment that assessing these ad valorem property taxes for these years is improper.


        Josh R. Morriss, III
        Chief Justice


Date Submitted:    June 18, 2008
Date Decided:     September 24, 2008