Opinion filed March 26, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed March 26,
2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-07-00048-CV

                                                    __________

 

    MIDLAND CENTRAL APPRAISAL DISTRICT,
Appellant/Cross-Appellee

 

                                                             V.

 

                      BP
AMERICA PRODUCTION COMPANY ET AL, 

                                         Appellees/Cross-Appellants


 



 

                                         On
Appeal from the 238th District Court

 

                                                        Midland
County, Texas

 

                                   Trial
Court Cause No. CV44864 (consolidated)

 



 

                                                                   O
P I N I O N

 








The
issue in this case is whether an ad valorem tax may be imposed on crude oil
located in Midland County in a tank farm that is an integral part of an
interstate, common carrier pipeline system.  In its appraisal rolls for 2003
and 2004, Midland Central Appraisal District (MCAD) included oil located in the
tank farm on January 1 of the respective years.  MCAD allocated ownership of
the oil to various shippers, including BP America Production Company; Amerada
Hess Trading Company; Chevron USA, Inc.; ChevronTexaco Products Company;
ChevronTexaco Global Supply and Trading Company; TEPPCO Crude Oil LLC; and
TEPPCO Crude P/L LLC (hereinafter referred to collectively as the Oil
Companies).  The Oil Companies properly protested and ultimately brought four
separate suits in district court.  After consolidating the suits and conducting
a nonjury trial, the trial court rendered judgment that the oil was not taxable
but denied the Oil Companies=
request for attorney=s
fees.  MCAD appeals the trial court=s
ruling regarding the taxability of the oil, and the Oil Companies appeal the
denial of attorney=s
fees.  We affirm.  

                                                                       I. 
Issues

MCAD
presents six issues for review.  In the first issue, MCAD contends that the
trial court erred as a matter of law in determining that the oil is not taxable
in Midland County.  In the second issue, MCAD contends that the trial court
erred in finding that oil had no situs in Midland County.  In the third issue,
MCAD contends that the trial court erred in holding that the oil was in
interstate commerce.  In its fourth issue, MCAD challenges the legal and
factual sufficiency of several findings of fact and asserts that the trial
court erred in considering the oil as individual barrels rather than an
aggregate inventory.  MCAD argues in its fifth issue that the trial court erred
in finding that the tax is not applied to an activity or oil with a substantial
nexus to Texas.  In its final issue, MCAD asserts that the trial court erred in
finding that MCAD=s
allocation of ownership of the oil was not reasonable. 

The
Oil Companies present two issues for review.  In their first issue, the Oil
Companies contend that the trial court erred in denying their request for
attorney=s fees
because the award of attorney=s
fees was mandated by statute, specifically Tex.
Tax Code Ann. '
42.29 (Vernon 2008).  In their second issue, the Oil Companies assert that MCAD
waived its challenge to the award of attorney=s
fees by requesting findings of fact that support the award.  

                                                             II. 
Background Facts








The
record shows that the underlying facts in this case are largely undisputed. 
The unchallenged findings of fact indicate that oil at issue in this case was
produced mostly in West Texas and a small amount in eastern New Mexico and was
injected into the Midland Pipeline System, a spiderweb configuration of
interconnecting pipelines covering more than two dozen counties in West Texas
and eastern New Mexico.  The Midland Pipeline System is an interstate, common
carrier pipeline system that is regulated by the Federal Energy Regulatory
Commission and is operated by various pipeline companies that are not parties
to these proceedings.  Upon injection of the subject oil into a pipeline,
control and custody was relinquished to the pipeline companies; the oil, being
fungible, became part of the common stream of oil.

Oil
in the system travels through pipelines in Texas, taking no more than two and
one-half weeks, to final destinations at various oil refineries located in
Texas and in other states.  During the journey, a large amount of oil passes
through the tank farm where the Midland Pipeline System converges.  The tank
farm functions as an integral part of the Midland Pipeline System and exists to
facilitate the transportation of the oil, not to store oil.  The oil in the
tank farm arrives and exits via the Midland Pipeline System.  The time from
entry into a tank to exit from a tank is six to seventy-two hours.  However, a
certain minimum volume of cushion oil is required to be maintained in each tank
for safety reasons and to meet emission standards, resulting in the constant
presence of a large amount of oil in the tank farm.  Blending, batching, or
staging of the oil may occur at the tank farm as necessary to facilitate the
transmission of the oil through the Midland Pipeline System, but these
processes do not interrupt the continuity of transit.  The tanks are not used
for storage.

Oil
is bought, sold, and traded by document transfers irrespective of where the oil
may be in the system.  These transfers do not alter the movement of the oil or
interrupt its in-transit movement to refineries.  Upon arrival at a refinery,
the oil is assessed and listed for taxation by the local appraisal authorities.[1] 
Furthermore, ad valorem taxes are assessed on the pipelines, tanks, physical
assets, and equipment at the tank farm.  In 2003 and 2004, those ad valorem taxes
were timely paid. 

                                                              III. 
MCAD=s
Appeal

A. 
Sufficiency of the Challenged Findings.

MCAD
challenges several of the trial court=s
findings regarding the temporariness of the oil in Midland County and in Texas,
the continuity of the oil=s
transit, the ultimate destination of the oil,  and the oil=s status as being in
interstate commerce.  MCAD argues in its fourth issue that there is no evidence
to support the challenged findings and that the evidence is factually
insufficient to support those findings.  MCAD also argues in its fourth issue
that the trial court erred in considering the oil as individual barrels of oil
rather than an oil inventory. 








We
review sufficiency challenges to a trial court=s
findings of fact under the same standards that we use to review a jury=s findings.  Catalina v.
Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); Anderson v. City of Seven
Points, 806 S.W.2d 791, 794 (Tex. 1991).  In analyzing a legal sufficiency
challenge, we must determine whether the evidence at trial would enable
reasonable and fair‑minded people to reach the verdict under review.  City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We must review the
evidence in the light most favorable to the challenged finding, crediting any
favorable evidence if a reasonable factfinder could and disregarding any
contrary evidence unless a reasonable factfinder could not.  Id. at 821‑22,
827.  We may sustain a no‑evidence or legal sufficiency challenge only
when (1) the record discloses a complete absence of a vital fact, (2) the court
is barred by rules of law or evidence from giving weight to the only evidence
offered to prove a vital fact, (3) the only evidence offered to prove a vital
fact is no more than a mere scintilla, or (4) the evidence conclusively
establishes the opposite of a vital fact.  Id. at 810 (citing Robert W.
Calvert, ANo Evidence@ and AInsufficient Evidence@ Points of Error, 38 Tex. L. Rev. 361, 362‑63
(1960)).  In analyzing a factual sufficiency challenge, we must consider and
weigh all of the evidence and determine whether the evidence in support of a
finding is so weak as to be clearly wrong and unjust or whether the finding is
so against the great weight and preponderance of the evidence as to be clearly
wrong and manifestly unjust.  Dow Chem. Co. v. Francis, 46 S.W.3d 237,
242 (Tex. 2001); Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex.
1986); In re King=s
Estate, 244 S.W.2d 660, 661 (Tex. 1951).  We review a trial court=s conclusions of law,
including those mislabeled as findings of fact, de novo.  See BMC Software
Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002).  

At
trial, several witnesses, including employees of the pipeline companies,
explained that a tank is basically a wide spot in a pipeline and that the tank
farm is simply a gathering location of multiple pipelines that bring barrels of
oil in at varying rates and varying pressures and allows the oil to be gathered
to move on to the next destination.  The Oil Companies are not allowed to store
oil in the pipeline system.  The oil in the tanks is in constant movement: 
either filling or withdrawing.  After reviewing all the evidence, we hold that,
although there is a substantial quantity of oil that is constantly present in
the tanks, the trial court=s
findings regarding the continuity of the oil=s
transit are supported by legally and factually sufficient evidence. 








MCAD
also challenges findings regarding the ultimate destination of the oil and the
oil=s status as being
in the stream of interstate commerce.  The trial court found that a vast majority
of the oil located in the tank farm is sent to refineries located outside of
Texas and that less than ten percent of the oil remains in Texas.  These
findings are supported by testimony showing that the oil passing through the
tank farm travels through the pipeline system and can be offloaded at only
three refineries in Texas.  Testimony showed that the amount of oil offloaded
at these three refineries amounts to less than ten percent of the oil that
passes through the tank farm in the pipeline system and that Athe rest of the oil has to
leave the state.@ 
After reviewing all of the evidence, we hold that the challenged findings of
fact are supported by legally and factually sufficient evidence.  To the extent
that MCAD=s fourth
issue challenges the sufficiency of the evidence, it is overruled.  

B. 
Was the Oil Taxable in Midland County?

Unless
exempt by law, tangible personal property in Texas is taxable if it is located
in Texas for longer than a temporary period, is temporarily located outside
Texas but the owner resides in Texas, or is used continually in Texas.  Tex. Tax Code Ann. ' 11.01 (Vernon 2008); see
also Tex. Tax Code Ann. ' 21.02 (Vernon 2008)
(taxable situs in taxing unit).  In determining whether the oil at issue in
this case was taxable, we address whether the oil was in the stream of
interstate commerce, whether the trial court erred in failing to consider the
oil as a constant presence in the tanks rather than individual barrels in
transit, and whether the oil had situs in Midland County.  We ultimately
conclude that the tax violated the Commerce Clause of the United States
Constitution, U.S. Const. art. I,
' 8, cl. 3, and that
the tax was not valid under Section 21.02(a)(1) due to the temporary period
during which the oil was located in Midland County. 

1.  Interstate Commerce.

The
first question is whether the oil had been placed into the stream of interstate
commerce.  MCAD argues that it had not.  Interstate commerce Aoccurs when goods >have been shipped, or
entered with a common carrier for transportation to another State, or have been
started upon such transportation in a continuous route or journey.=@  Va. Indon. Co. v. Harris County Appraisal
Dist., 910 S.W.2d 905, 908 (Tex. 1995) (VICO) (citing Coe v.
Errol, 116 U.S. 517, 527 (1886)). 








The
trial court found and the uncontroverted evidence indicates that, prior to
making its way to the tank farm, the subject oil was injected into a federally
regulated, interstate common carrier pipeline system.  Once injected, the oil
remained in the pipeline and under the pipeline=s
control until it reached its ultimate destination, a refinery.  The evidence
also shows that the tanks in the tank farm are and were an integral part of the
interstate pipeline system and that, although the destination of the oil
actually in the tanks at the time of the assessment could not be determined,
over ninety percent of the oil passing through the tank farm was transported to
refineries out of state.  See Eureka Pipe Line Co. v. Hallanan, 257 U.S.
265, 272 (1921) (stating that a tank in an oil pipeline Amay be regarded as a pipe of larger size@). 

The
next question is whether the oil remained in transit in the stream of
interstate commerce when it was at the tank farm.  MCAD asserts that the
subject oil should be viewed as a massive constant presence of oil in the tank
farm and that, if so viewed, it cannot be concluded that the oil was in
interstate commerce or that it was only temporarily in Midland County.  In
support of this contention, MCAD relies upon Diamond Shamrock Refining and
Marketing Co. v. Nueces County Appraisal District, 876 S.W.2d 298 (Tex.
1994), and Exxon Corp. v. San Patricio County Appraisal District, 822
S.W.2d 269 (Tex. App.CCorpus
Christi 1991, writ denied).  We find these cases to be factually
distinguishable.  








In
Diamond Shamrock, the supreme court held that oil stored in tanks was
subject to an ad valorem tax where the oil was imported from abroad into
Texas, which was its final destination.  876 S.W.2d 298.  Upon arriving in
Texas, the oil, which was owned by Diamond Shamrock and destined for Diamond
Shamrock=s refinery in
Texas, was offloaded into a storage facility and stored in tanks before being
transported to a refinery in another county by pipeline.  Although the parties
stipulated that the oil at issue was Ain
transit,@ the court
determined that the situs of each barrel should not be considered because the
incidence of the tax imposed was the year-round presence in the storage
facility of a large volume of oil belonging to Diamond Shamrock.  Id. at
300-04.  The court in Diamond Shamrock specifically limited its holding
to foreign goods in transit through only one state that remain in that state.  Id.
at 302, n.7.  Furthermore, the oil at issue in Diamond Shamrock was
located in a storage facility, whereas the oil at issue in this case had been
injected into interstate common carrier pipelines and was located in tanks that
were an integral part of the common carrier pipeline system within the stream
of interstate commerce.  Even when viewed as a constant presence, the oil at
issue in this case, like the massive quantity of oil constantly present within
the pipelines themselves, was located in the stream of interstate commerce
where it had been commingled with oil from numerous other shippers and was B for the most part B being transported to
another state. 

In
Exxon, as in the present case, oil that was located in working tanks was
taxed.  822 S.W.2d  269.  The court ruled that, although each individual barrel
remained in the county for no longer than seventeen days, the oil acquired
situs there because Exxon maintained at all times a massive quantity of oil in
the tanks.  Id. at 272-74.  As in Diamond Shamrock, however, the
oil in Exxon was not destined for any location outside the State of
Texas.  The oil at issue in Exxon was transported, refined, and sold in
Texas.  Id. at 272.  Nothing in the court=s
opinion in Exxon indicates that interstate commerce was involved.  

Subsequent
to its opinion in Diamond Shamrock, the Texas Supreme Court considered
and struck down an ad valorem tax assessed on goods that had been placed into
the export stream of commerce but were temporarily located in a facility
belonging to an independent export packer.  VICO, 910 S.W.2d at 906-08. 
Although the court in VICO relied upon the Import-Export Clause, U.S. Const. art. I, ' 10, rather than the
Commerce Clause to invalidate the tax, the court recognized that the doctrine
used to determine whether goods are in transit at the time of taxation applies
equally under either clause.  Id. at 908 & n.1.  The court
recognized the year-round presence in the packer=s
facility of goods belonging to VICO but did not rely on the goods= constant presence as a
factor in its determination that the goods remained in transit and in the
stream of export.  Id. at 907-14.  








In
VICO, the goods had been committed to foreign export and were
transported to the packer=s
facility to be checked, approved for import into Indonesia, inspected,
packaged, and cleared for shipping.  Id. at 907, 913-14.  The court held
that the temporary stoppage of the goods at the packer=s facility, which usually took no more than
forty-five days, did not break the continuity of transit and that the goods
remained in the stream of export.  Id. at 907, 912-14.  In determining
whether the stoppage disrupted the continuity of transit, the court in VICO
followed Supreme Court precedent and reasoned that it Ais the purpose of the stoppage that is
important.@  Id.
at 912 (citing Champlain Realty Co. v. Town of Brattleboro, 260 U.S. 366,
376-77 (1922), and Minnesota v. Blasius, 290 U.S. 1, 11-12 (1933)). 
When the stoppage is attributable to a business purpose of the owner, the
in-transit status is deemed to have terminated, and the goods are subject to
taxation in the jurisdiction where they are stopped.  Id.  In contrast,
if the stoppage is a necessity of the journey or for the purpose of safety and
convenience in the course of the journey, the stoppage does not interrupt the
continuity of transit.  Id.  

In
the present case, the Astoppage@ was not related to a
business purpose of the owner.  The evidence and the trial court=s findings indicate that,
barring any malfunction, oil is delayed for six to seventy-two hours in the
tank farm for purposes related to the operation of the pipeline system.  Each
tank is required to maintain 8,000 to 10,000 barrels of oil as a cushion for
safety and emission reasons.  Oil may also be delayed for blending, batching,
or staging B
operational functions of the pipeline system that are necessary to facilitate
the transmission of the oil.[2]  Thus, as in VICO,
the Astoppage@ of the oil did not
interrupt the continuity of transit.  

We
hold that the trial court correctly determined that the oil was in the stream
of interstate commerce.  The oil had been injected into a common carrier
pipeline system and remained in that interstate system at the time of the tax
assessment.  Any delay at the tank farm was not attributable to the Oil
Companies but, rather, was incidental to the transportation of the oil by the
common carrier and was necessary for the safe and efficient operation of the
pipeline system.  

2.  Validity of Tax Under Commerce Clause.








Next,
we must determine whether the tax on the oil in interstate transit violated the
Commerce Clause.  The Commerce Clause grants Congress the power to regulate
interstate commerce and implicitly prohibits certain state regulation of
interstate commercial activity.  Okla. Tax Comm=n v. Jefferson Lines, Inc.,
514 U.S. 175 (1995).  However, not all state taxes on interstate commerce are
prohibited.  Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977). 
Pursuant to Complete Auto, a state tax does not violate the Commerce
Clause if it meets a four-pronged test set out by the Court.  To be valid, the
tax must (1) apply to an activity with a substantial nexus with the taxing
state, (2) be fairly apportioned, (3) not discriminate against interstate
commerce, and (4) be fairly related to the services provided by the state.  Id.
at 279, 287; Vinmar, Inc. v. Harris County Appraisal Dist., 947 S.W.2d
554, 555 (Tex. 1997).  To establish that a state tax is unconstitutional, the
taxpayer need only prove that the tax fails one prong of the Complete Auto
test.  Vinmar, 947 S.W.2d at 555.  

The
trial court concluded that the tax violated the Commerce Clause and that the
tax did not satisfy the Asubstantial
nexus@ requirement of
the Complete Auto test.  The substantial nexus requirement of Complete
Auto is a means for limiting state burdens on interstate commerce.  Quill
Corp. v. North Dakota, 504 U.S. 298, 313 (1992).  

In
support of their contention regarding substantial nexus, the Oil Companies cite
to a recent opinion of the Texarkana Court of Appeals, Peoples Gas, Light,
& Coke Co. v. Harrison Central Appraisal District, 270 S.W.3d 208 (Tex.
App.CTexarkana 2008,
pets. filed).  In Peoples, the court struck down an ad valorem tax assessed
against the owner of natural gas on gas that had been placed into the stream of
interstate commerce and was located in an underground storage facility owned by
an interstate pipeline company.  The court determined that the tax violated the
Commerce Clause because the gas owner=s
activities in Texas and its connection to Texas were too tenuous to create a
substantial nexus.  270 S.W.3d at 218.  

In
contrast, MCAD asserts that we should not follow Peoples but should
instead follow the decision reached by the Supreme Court of Oklahoma in In
re Assessment of Personal Property Taxes Against Missouri Gas Energy, a
Division of Southern Union Co., No. 103,355, 2008 WL 4648330 (Okla. Oct.
21, 2008).  In Missouri Gas, the court upheld an ad valorem tax on gas
held in an underground storage facility owned and operated by an interstate,
common carrier pipeline.  Missouri Gas Energy owned the gas, which was
ultimately transported out of state.  The Oklahoma court determined that the
gas was not merely passing through the county to an out-of-state destination
because the large volumes of gas that were stored in the facility for a
substantial part of the year were Anot
in transit in such a way as to invoke the protection of the Commerce Clause.@ 2008 WL 4648330, at *11.  

We
find at least one crucial fact of Missouri Gas to be distinguishable
from the facts of the present case.  The crude oil in the present case was not
in storage but, rather, was in transit in the stream of interstate commerce. 
For this same reason, the case at hand presents an even stronger case for a
Commerce Clause violation than did the circumstances in Peoples.  








To
comply with the first prong of the Complete Auto test, the ad valorem
tax on the oil in the tank farm must have applied to an activity with a
substantial nexus with Texas.  Although the oil itself had a substantial nexus
with this state as much of it was produced in this state and some of it was
destined for an in-state refinery, the Aactivity@ being taxed had no such
nexus.  The activity essentially being taxed in this case was the ownership of
oil that was present but in transit on January 1 in a tank farm that
constituted an integral part of an interstate, common carrier pipeline system.

Furthermore,
if the tax in this case is upheld, then ad valorem taxes could potentially be
levied by any taxing authority on oil in transit but located, at the time of
assessment, in the portion of an interstate pipeline system within the
boundaries of that taxing authority.  The result would be an impermissible
multiple burden on interstate commerce.   See Michigan-Wisconsin Pipe Line
Co. v. Calvert, 347 U.S. 157, 170 (1954) (holding that tax on taking
of gas into interstate pipeline infringed upon the Commerce Clause and
recognizing that such tax would permit a multiple burden upon commerce because
other states could impose a tax on the first taking of the same gas in their
state).  We hold that the tax in the present case does not satisfy the Complete
Auto test and that it runs afoul of the Commerce Clause.  

3.  Validity of Tax Pursuant to State Law.

Section
21.02 provides in relevant part that tangible property in Texas is taxable by a
taxing unit if Ait is
located in the unit on January 1 for more than a temporary period.@  Section 21.02(a)(1).[3] 
The trial court concluded that the oil was not located in Midland County for
longer than a temporary period.  We agree.  








As
discussed above, the record shows that the oil had been injected into an
interstate, common carrier pipeline system; that the oil merely traveled
through Midland County in the pipeline system; that any delay of the oil in the
tank farm was temporary and was necessary only to facilitate the continued
transportation of the oil; and that the tank farm was not used for storage. 
Although much of the oil had a nexus with Texas in that it was produced in
Texas, it had no such nexus with Midland County.  The oil was merely
transported through Midland County  and was only temporarily located in the
county.  Thus, we hold that the trial court did not err in concluding that the
oil had no taxable situs in Midland County.  

The
tax was not valid under the Commerce Clause or Section 21.02(a)(1). 
Consequently, MCAD=s
first, second, third, fourth, and fifth issues are overruled.  We need not
reach MCAD=s sixth
issue concerning allocation of ownership.  Tex.
R. App. P. 47.1. 

                                                        IV. 
Oil Companies=
Appeal

The
Oil Companies appeal the trial court=s
refusal to award them attorney=s
fees.  In Texas, attorney=s
fees are recoverable from an opposing party only when authorized by statute or
by contract between the parties.  Travelers Indem. Co. of Conn. v. Mayfield,
923 S.W.2d 590, 593 (Tex. 1996).  The Oil Companies assert that attorney=s fees were authorized by
Section 42.29 of the Tax Code.  The trial court entered findings of fact as to
the amount of attorney=s
fees that would be reasonable if recoverable under Section 42.29.  The trial
court concluded, however, that the Oil Companies were not entitled to attorney=s fees under Section 42.29.








Section
42.29 provides that a Aproperty
owner who prevails in an appeal to the court under Section 42.25 or 42.26 may
be awarded reasonable attorney=s
fees.@  Tex. Tax Code Ann. ' 42.25 (Vernon 2008)
provides a remedy for an excessive appraisal, entitling the owner to a
reduction of the appraised value on the appraisal roll.  Tex. Tax Code Ann. ' 42.26 (Vernon 2008)
provides a remedy for the unequal appraisal of property in relation to the
appraised values of other properties.  Sections 42.25 and 42.26 do not apply to
this case because the Oil Companies did not challenge the appraised value of
the oil; they challenged the ability of Midland County to tax the oil. 
Consequently, since the Oil Companies did not prevail on a claim Aunder Section 42.25 or
42.26,@ attorney=s fees were not authorized
by Section 42.29.  If the legislature had intended for attorney=s fees to be recoverable in
a case of this type, it could have included in its Section 42.29 authorization
of attorney=s fees an
appeal challenging the inclusion of the property on the appraisal roll, the
determination of ownership, or the denial of an exemption.  The legislature
specifically authorized such protests in Tex.
Tax Code Ann. '
41.41(a) (Vernon 2008) (listing nine distinct actions that may be protested by
taxpayer, including:  excessive value, unequal appraisal, denial of an
exemption, ownership, and inclusion on tax roll).  The legislature, however,
did not authorize attorney=s
fees for all such protests.  Section 42.29 authorizes attorney=s fees for only two
distinct types of protest: excessive value and unequal appraisal.  Dallas
Cent. Appraisal Dist. v. Seven Inv. Co., 835 S.W.2d 75, 77-79 (Tex. 1992). 
The Oil Companies=
protest cannot be categorized as falling within either of those two.  See
id.  The Oil Companies=
first issue is overruled. 

In
the second issue, the Oil Companies assert that MCAD waived any complaint it
had to the award of attorney=s
fees by requesting findings of fact that supported an award of attorney=s fees.  We disagree.  MCAD
repeatedly objected to issues related to the prospective award of attorney=s fees, and MCAD did not
request any findings of fact that would entitle the Oil Companies to attorney=s fees or waive MCAD=s objection to such fees. 
MCAD merely requested that the trial court amend its findings regarding
attorney=s fees to
omit the phrase Arecoverable
under Tax Code '
42.29.@  The requested
amendments reflected MCAD=s
continued objection to the award of attorney=s
fees and continued contention that the fees were not Arecoverable.@ 
Moreover, MCAD did not ask the trial court to amend Conclusion of Law No. 9,
wherein the trial court concluded:  AThe
Oil Companies are not entitled to attorney=s
fees under Tax Code '
42.29.@  MCAD did not
waive its complaint to the award of attorney=s
fees.  The Oil Companies=
second issue is overruled.          V.  Conclusion

The
judgment of the trial court is affirmed.  

 

 

JIM R. WRIGHT

CHIEF JUSTICE

March 26, 2009

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]We note also that a production tax is levied on oil
that is produced in Texas.  Tex. Tax
Code Ann. ' 202.051 (Vernon 2008). 





[2]Blending is the mixing of oil of low sulfur content
(sweet crude) with oil of higher sulfur content (sour crude).  Batching keeps
oil of different grades separate.  Staging is the accumulation of sufficient
volumes of oil necessary for transmission in the pipeline system.





[3]We note that MCAD asserts in its brief that the oil is
also taxable pursuant to Section 21.02(a)(4), which allows personal property to
be taxed if Athe owner resides (for property not used for business
purposes) or maintains the owner=s principal
place of business in this state (for property used for business purposes) in
the unit and the property is taxable in this state but does not have a taxable
situs pursuant to Subdivisions (1) through (3) of this subsection.@  However, the trial court made no findings of fact on
this issue, and MCAD did not request that the trial court make a finding
regarding the principal place of business.  Moreover, the evidence does not
indicate that Midland County is the principal place of business in this state
for any of the Oil Companies.