**Opinion filed March 26, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-07-00048-CV

_____

## MIDLAND CENTRAL APPRAISAL DISTRICT, Appellant/Cross-Appellee

## V.

## BP AMERICA PRODUCTION COMPANY ET AL, Appellees/Cross-Appellants

### On Appeal from the 238th District Court

### Midland County, Texas

### Trial Court Cause No. CV44864 (consolidated)

## O P I N I O N

The issue in this case is whether an ad valorem tax may be imposed on crude oil located in Midland County in a tank farm that is an integral part of an interstate, common carrier pipeline system. In its appraisal rolls for 2003 and 2004, Midland Central Appraisal District (MCAD) included oil located in the tank farm on January 1 of the respective years. MCAD allocated ownership of the oil to various shippers, including BP America Production Company; Amerada Hess Trading Company; Chevron USA, Inc.; ChevronTexaco Products Company; ChevronTexaco Global

Supply and Trading Company; TEPPCO Crude Oil LLC; and TEPPCO Crude P/L LLC (hereinafter referred to collectively as the Oil Companies). The Oil Companies properly protested and ultimately brought four separate suits in district court. After consolidating the suits and conducting a nonjury trial, the trial court rendered judgment that the oil was not taxable but denied the Oil Companies' request for attorney's fees. MCAD appeals the trial court's ruling regarding the taxability of the oil, and the Oil Companies appeal the denial of attorney's fees. We affirm.

## I. *Issues*

MCAD presents six issues for review. In the first issue, MCAD contends that the trial court erred as a matter of law in determining that the oil is not taxable in Midland County. In the second issue, MCAD contends that the trial court erred in finding that oil had no situs in Midland County. In the third issue, MCAD contends that the trial court erred in holding that the oil was in interstate commerce. In its fourth issue, MCAD challenges the legal and factual sufficiency of several findings of fact and asserts that the trial court erred in considering the oil as individual barrels rather than an aggregate inventory. MCAD argues in its fifth issue that the trial court erred in finding that the tax is not applied to an activity or oil with a substantial nexus to Texas. In its final issue, MCAD asserts that the trial court erred in finding that MCAD's allocation of ownership of the oil was not reasonable.

The Oil Companies present two issues for review. In their first issue, the Oil Companies contend that the trial court erred in denying their request for attorney's fees because the award of attorney's fees was mandated by statute, specifically TEX. TAX CODE ANN. § 42.29 (Vernon 2008). In their second issue, the Oil Companies assert that MCAD waived its challenge to the award of attorney's fees by requesting findings of fact that support the award.

## II. *Background Facts*

The record shows that the underlying facts in this case are largely undisputed. The unchallenged findings of fact indicate that oil at issue in this case was produced mostly in West Texas and a small amount in eastern New Mexico and was injected into the Midland Pipeline System, a spiderweb configuration of interconnecting pipelines covering more than two dozen counties in West Texas and eastern New Mexico. The Midland Pipeline System is an interstate, common carrier pipeline system that is regulated by the Federal Energy Regulatory Commission and

2

is operated by various pipeline companies that are not parties to these proceedings. Upon injection of the subject oil into a pipeline, control and custody was relinquished to the pipeline companies; the oil, being fungible, became part of the common stream of oil.

Oil in the system travels through pipelines in Texas, taking no more than two and one-half weeks, to final destinations at various oil refineries located in Texas and in other states. During the journey, a large amount of oil passes through the tank farm where the Midland Pipeline System converges. The tank farm functions as an integral part of the Midland Pipeline System and exists to facilitate the transportation of the oil, not to store oil. The oil in the tank farm arrives and exits via the Midland Pipeline System. The time from entry into a tank to exit from a tank is six to seventy-two hours. However, a certain minimum volume of cushion oil is required to be maintained in each tank for safety reasons and to meet emission standards, resulting in the constant presence of a large amount of oil in the tank farm. Blending, batching, or staging of the oil may occur at the tank farm as necessary to facilitate the transmission of the oil through the Midland Pipeline System, but these processes do not interrupt the continuity of transit. The tanks are not used for storage.

Oil is bought, sold, and traded by document transfers irrespective of where the oil may be in the system. These transfers do not alter the movement of the oil or interrupt its in-transit movement to refineries. Upon arrival at a refinery, the oil is assessed and listed for taxation by the local appraisal authorities.[1] Furthermore, ad valorem taxes are assessed on the pipelines, tanks, physical assets, and equipment at the tank farm. In 2003 and 2004, those ad valorem taxes were timely paid.

III. *MCAD's Appeal*

*A. Sufficiency of the Challenged Findings.*

MCAD challenges several of the trial court's findings regarding the temporariness of the oil in Midland County and in Texas, the continuity of the oil's transit, the ultimate destination of the oil, and the oil's status as being in interstate commerce. MCAD argues in its fourth issue that there is no evidence to support the challenged findings and that the evidence is factually insufficient to support those findings. MCAD also argues in its fourth issue that the trial court erred in considering the oil as individual barrels of oil rather than an oil inventory.

---

[1]We note also that a production tax is levied on oil that is produced in Texas. TEX. TAX CODE ANN. § 202.051 (Vernon 2008).

3

We review sufficiency challenges to a trial court's findings of fact under the same standards that we use to review a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). In analyzing a legal sufficiency challenge, we must determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We must review the evidence in the light most favorable to the challenged finding, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 821-22, 827. We may sustain a no-evidence or legal sufficiency challenge only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362-63 (1960)). In analyzing a factual sufficiency challenge, we must consider and weigh all of the evidence and determine whether the evidence in support of a finding is so weak as to be clearly wrong and unjust or whether the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951). We review a trial court's conclusions of law, including those mislabeled as findings of fact, de novo. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

At trial, several witnesses, including employees of the pipeline companies, explained that a tank is basically a wide spot in a pipeline and that the tank farm is simply a gathering location of multiple pipelines that bring barrels of oil in at varying rates and varying pressures and allows the oil to be gathered to move on to the next destination. The Oil Companies are not allowed to store oil in the pipeline system. The oil in the tanks is in constant movement: either filling or withdrawing. After reviewing all the evidence, we hold that, although there is a substantial quantity of oil that is constantly present in the tanks, the trial court's findings regarding the continuity of the oil's transit are supported by legally and factually sufficient evidence.

4

MCAD also challenges findings regarding the ultimate destination of the oil and the oil's status as being in the stream of interstate commerce. The trial court found that a vast majority of the oil located in the tank farm is sent to refineries located outside of Texas and that less than ten percent of the oil remains in Texas. These findings are supported by testimony showing that the oil passing through the tank farm travels through the pipeline system and can be offloaded at only three refineries in Texas. Testimony showed that the amount of oil offloaded at these three refineries amounts to less than ten percent of the oil that passes through the tank farm in the pipeline system and that "the rest of the oil has to leave the state." After reviewing all of the evidence, we hold that the challenged findings of fact are supported by legally and factually sufficient evidence. To the extent that MCAD's fourth issue challenges the sufficiency of the evidence, it is overruled.

### B. Was the Oil Taxable in Midland County?

Unless exempt by law, tangible personal property in Texas is taxable if it is located in Texas for longer than a temporary period, is temporarily located outside Texas but the owner resides in Texas, or is used continually in Texas. TEX. TAX CODE ANN. § 11.01 (Vernon 2008); *see also* TEX. TAX CODE ANN. § 21.02 (Vernon 2008) (taxable situs in taxing unit). In determining whether the oil at issue in this case was taxable, we address whether the oil was in the stream of interstate commerce, whether the trial court erred in failing to consider the oil as a constant presence in the tanks rather than individual barrels in transit, and whether the oil had situs in Midland County. We ultimately conclude that the tax violated the Commerce Clause of the United States Constitution, U.S. CONST. art. I, § 8, cl. 3, and that the tax was not valid under Section 21.02(a)(1) due to the temporary period during which the oil was located in Midland County.

### 1. Interstate Commerce.

The first question is whether the oil had been placed into the stream of interstate commerce. MCAD argues that it had not. Interstate commerce "occurs when goods 'have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey.'" *Va. Indon. Co. v. Harris County Appraisal Dist.*, 910 S.W.2d 905, 908 (Tex. 1995) (*VICO*) (citing *Coe v. Errol*, 116 U.S. 517, 527 (1886)).

The trial court found and the uncontroverted evidence indicates that, prior to making its way to the tank farm, the subject oil was injected into a federally regulated, interstate common carrier

pipeline system. Once injected, the oil remained in the pipeline and under the pipeline's control until it reached its ultimate destination, a refinery. The evidence also shows that the tanks in the tank farm are and were an integral part of the interstate pipeline system and that, although the destination of the oil actually in the tanks at the time of the assessment could not be determined, over ninety percent of the oil passing through the tank farm was transported to refineries out of state. *See Eureka Pipe Line Co. v. Hallanan*, 257 U.S. 265, 272 (1921) (stating that a tank in an oil pipeline "may be regarded as a pipe of larger size").

The next question is whether the oil remained in transit in the stream of interstate commerce when it was at the tank farm. MCAD asserts that the subject oil should be viewed as a massive constant presence of oil in the tank farm and that, if so viewed, it cannot be concluded that the oil was in interstate commerce or that it was only temporarily in Midland County. In support of this contention, MCAD relies upon *Diamond Shamrock Refining and Marketing Co. v. Nueces County Appraisal District*, 876 S.W.2d 298 (Tex. 1994), and *Exxon Corp. v. San Patricio County Appraisal District*, 822 S.W.2d 269 (Tex. App.—Corpus Christi 1991, writ denied). We find these cases to be factually distinguishable.

In *Diamond Shamrock*, the supreme court held that oil stored in tanks was subject to an ad valorem tax where the oil was imported from abroad into Texas, which was its final destination. 876 S.W.2d 298. Upon arriving in Texas, the oil, which was owned by Diamond Shamrock and destined for Diamond Shamrock's refinery in Texas, was offloaded into a storage facility and stored in tanks before being transported to a refinery in another county by pipeline. Although the parties stipulated that the oil at issue was "in transit," the court determined that the situs of each barrel should not be considered because the incidence of the tax imposed was the year-round presence in the storage facility of a large volume of oil belonging to Diamond Shamrock. *Id.* at 300-04. The court in *Diamond Shamrock* specifically limited its holding to foreign goods in transit through only one state that remain in that state. *Id.* at 302, n.7. Furthermore, the oil at issue in *Diamond Shamrock* was located in a storage facility, whereas the oil at issue in this case had been injected into interstate common carrier pipelines and was located in tanks that were an integral part of the common carrier pipeline system within the stream of interstate commerce. Even when viewed as a constant presence, the oil at issue in this case, like the massive quantity of oil constantly present

6

within the pipelines themselves, was located in the stream of interstate commerce where it had been commingled with oil from numerous other shippers and was – for the most part – being transported to another state.

In *Exxon*, as in the present case, oil that was located in working tanks was taxed. 822 S.W.2d 269. The court ruled that, although each individual barrel remained in the county for no longer than seventeen days, the oil acquired situs there because Exxon maintained at all times a massive quantity of oil in the tanks. *Id.* at 272-74. As in *Diamond Shamrock*, however, the oil in *Exxon* was not destined for any location outside the State of Texas. The oil at issue in *Exxon* was transported, refined, and sold in Texas. *Id.* at 272. Nothing in the court's opinion in *Exxon* indicates that interstate commerce was involved.

Subsequent to its opinion in *Diamond Shamrock*, the Texas Supreme Court considered and struck down an ad valorem tax assessed on goods that had been placed into the export stream of commerce but were temporarily located in a facility belonging to an independent export packer. *VICO*, 910 S.W.2d at 906-08. Although the court in *VICO* relied upon the Import-Export Clause, U.S. CONST. art. I, § 10, rather than the Commerce Clause to invalidate the tax, the court recognized that the doctrine used to determine whether goods are in transit at the time of taxation applies equally under either clause. *Id.* at 908 & n.1. The court recognized the year-round presence in the packer's facility of goods belonging to VICO but did not rely on the goods' constant presence as a factor in its determination that the goods remained in transit and in the stream of export. *Id.* at 907-14.

In *VICO*, the goods had been committed to foreign export and were transported to the packer's facility to be checked, approved for import into Indonesia, inspected, packaged, and cleared for shipping. *Id.* at 907, 913-14. The court held that the temporary stoppage of the goods at the packer's facility, which usually took no more than forty-five days, did not break the continuity of transit and that the goods remained in the stream of export. *Id.* at 907, 912-14. In determining whether the stoppage disrupted the continuity of transit, the court in *VICO* followed Supreme Court precedent and reasoned that it "is the *purpose* of the stoppage that is important." *Id.* at 912 (citing *Champlain Realty Co. v. Town of Brattleboro*, 260 U.S. 366, 376-77 (1922), and *Minnesota v. Blasius*, 290 U.S. 1, 11-12 (1933)). When the stoppage is attributable to a business purpose of the owner, the in-transit status is deemed to have terminated, and the goods are subject to taxation in the

7

jurisdiction where they are stopped. *Id.* In contrast, if the stoppage is a necessity of the journey or for the purpose of safety and convenience in the course of the journey, the stoppage does not interrupt the continuity of transit. *Id.*

In the present case, the "stoppage" was not related to a business purpose of the owner. The evidence and the trial court's findings indicate that, barring any malfunction, oil is delayed for six to seventy-two hours in the tank farm for purposes related to the operation of the pipeline system. Each tank is required to maintain 8,000 to 10,000 barrels of oil as a cushion for safety and emission reasons. Oil may also be delayed for blending, batching, or staging – operational functions of the pipeline system that are necessary to facilitate the transmission of the oil.[2] Thus, as in *VICO*, the "stoppage" of the oil did not interrupt the continuity of transit.

We hold that the trial court correctly determined that the oil was in the stream of interstate commerce. The oil had been injected into a common carrier pipeline system and remained in that interstate system at the time of the tax assessment. Any delay at the tank farm was not attributable to the Oil Companies but, rather, was incidental to the transportation of the oil by the common carrier and was necessary for the safe and efficient operation of the pipeline system.

### 2. Validity of Tax Under Commerce Clause.

Next, we must determine whether the tax on the oil in interstate transit violated the Commerce Clause. The Commerce Clause grants Congress the power to regulate interstate commerce and implicitly prohibits certain state regulation of interstate commercial activity. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995). However, not all state taxes on interstate commerce are prohibited. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977). Pursuant to *Complete Auto*, a state tax does not violate the Commerce Clause if it meets a four-pronged test set out by the Court. To be valid, the tax must (1) apply to an activity with a substantial nexus with the taxing state, (2) be fairly apportioned, (3) not discriminate against interstate commerce, and (4) be fairly related to the services provided by the state. *Id.* at 279, 287; *Vinmar, Inc. v. Harris County Appraisal Dist.*, 947 S.W.2d 554, 555 (Tex. 1997). To establish that a state tax is unconstitutional,

---

[2]Blending is the mixing of oil of low sulfur content (sweet crude) with oil of higher sulfur content (sour crude). Batching keeps oil of different grades separate. Staging is the accumulation of sufficient volumes of oil necessary for transmission in the pipeline system.

the taxpayer need only prove that the tax fails one prong of the *Complete Auto* test. *Vinmar*, 947 S.W.2d at 555.

The trial court concluded that the tax violated the Commerce Clause and that the tax did not satisfy the "substantial nexus" requirement of the *Complete Auto* test. The substantial nexus requirement of *Complete Auto* is a means for limiting state burdens on interstate commerce. *Quill Corp. v. North Dakota*, 504 U.S. 298, 313 (1992).

In support of their contention regarding substantial nexus, the Oil Companies cite to a recent opinion of the Texarkana Court of Appeals, *Peoples Gas, Light, & Coke Co. v. Harrison Central Appraisal District*, 270 S.W.3d 208 (Tex. App.—Texarkana 2008, pets. filed). In *Peoples*, the court struck down an ad valorem tax assessed against the owner of natural gas on gas that had been placed into the stream of interstate commerce and was located in an underground storage facility owned by an interstate pipeline company. The court determined that the tax violated the Commerce Clause because the gas owner's activities in Texas and its connection to Texas were too tenuous to create a substantial nexus. 270 S.W.3d at 218.

In contrast, MCAD asserts that we should not follow *Peoples* but should instead follow the decision reached by the Supreme Court of Oklahoma in *In re Assessment of Personal Property Taxes Against Missouri Gas Energy, a Division of Southern Union Co.*, No. 103,355, 2008 WL 4648330 (Okla. Oct. 21, 2008). In *Missouri Gas*, the court upheld an ad valorem tax on gas held in an underground storage facility owned and operated by an interstate, common carrier pipeline. Missouri Gas Energy owned the gas, which was ultimately transported out of state. The Oklahoma court determined that the gas was not merely passing through the county to an out-of-state destination because the large volumes of gas that were stored in the facility for a substantial part of the year were "not in transit in such a way as to invoke the protection of the Commerce Clause." 2008 WL 4648330, at *11.

We find at least one crucial fact of *Missouri Gas* to be distinguishable from the facts of the present case. The crude oil in the present case was not in storage but, rather, was in transit in the stream of interstate commerce. For this same reason, the case at hand presents an even stronger case for a Commerce Clause violation than did the circumstances in *Peoples*.

9

To comply with the first prong of the *Complete Auto* test, the ad valorem tax on the oil in the tank farm must have applied to an activity with a substantial nexus with Texas. Although the oil itself had a substantial nexus with this state as much of it was produced in this state and some of it was destined for an in-state refinery, the "activity" being taxed had no such nexus. The activity essentially being taxed in this case was the ownership of oil that was present but in transit on January 1 in a tank farm that constituted an integral part of an interstate, common carrier pipeline system.

Furthermore, if the tax in this case is upheld, then ad valorem taxes could potentially be levied by any taxing authority on oil in transit but located, at the time of assessment, in the portion of an interstate pipeline system within the boundaries of that taxing authority. The result would be an impermissible multiple burden on interstate commerce. *See Michigan-Wisconsin Pipe Line Co. v. Calvert*, 347 U.S. 157, 170 (1954) (holding that tax on taking of gas into interstate pipeline infringed upon the Commerce Clause and recognizing that such tax would permit a multiple burden upon commerce because other states could impose a tax on the first taking of the same gas in their state). We hold that the tax in the present case does not satisfy the *Complete Auto* test and that it runs afoul of the Commerce Clause.

### 3. Validity of Tax Pursuant to State Law.

Section 21.02 provides in relevant part that tangible property in Texas is taxable by a taxing unit if "it is located in the unit on January 1 for more than a temporary period." Section 21.02(a)(1).[3] The trial court concluded that the oil was not located in Midland County for longer than a temporary period. We agree.

As discussed above, the record shows that the oil had been injected into an interstate, common carrier pipeline system; that the oil merely traveled through Midland County in the pipeline system; that any delay of the oil in the tank farm was temporary and was necessary only to facilitate the continued transportation of the oil; and that the tank farm was not used for storage. Although

---

[3]We note that MCAD asserts in its brief that the oil is also taxable pursuant to Section 21.02(a)(4), which allows personal property to be taxed if "the owner resides (for property not used for business purposes) or maintains the owner's principal place of business in this state (for property used for business purposes) in the unit and the property is taxable in this state but does not have a taxable situs pursuant to Subdivisions (1) through (3) of this subsection." However, the trial court made no findings of fact on this issue, and MCAD did not request that the trial court make a finding regarding the principal place of business. Moreover, the evidence does not indicate that Midland County is the principal place of business in this state for any of the Oil Companies.

10

much of the oil had a nexus with Texas in that it was produced in Texas, it had no such nexus with Midland County. The oil was merely transported through Midland County and was only temporarily located in the county. Thus, we hold that the trial court did not err in concluding that the oil had no taxable situs in Midland County.

The tax was not valid under the Commerce Clause or Section 21.02(a)(1). Consequently, MCAD's first, second, third, fourth, and fifth issues are overruled. We need not reach MCAD's sixth issue concerning allocation of ownership. TEX. R. APP. P. 47.1.

### IV. *Oil Companies' Appeal*

The Oil Companies appeal the trial court's refusal to award them attorney's fees. In Texas, attorney's fees are recoverable from an opposing party only when authorized by statute or by contract between the parties. *Travelers Indem. Co. of Conn. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996). The Oil Companies assert that attorney's fees were authorized by Section 42.29 of the Tax Code. The trial court entered findings of fact as to the amount of attorney's fees that would be reasonable if recoverable under Section 42.29. The trial court concluded, however, that the Oil Companies were not entitled to attorney's fees under Section 42.29.

Section 42.29 provides that a "property owner who prevails in an appeal to the court under Section 42.25 or 42.26 may be awarded reasonable attorney's fees." TEX. TAX CODE ANN. § 42.25 (Vernon 2008) provides a remedy for an excessive appraisal, entitling the owner to a reduction of the appraised value on the appraisal roll. TEX. TAX CODE ANN. § 42.26 (Vernon 2008) provides a remedy for the unequal appraisal of property in relation to the appraised values of other properties. Sections 42.25 and 42.26 do not apply to this case because the Oil Companies did not challenge the appraised value of the oil; they challenged the ability of Midland County to tax the oil. Consequently, since the Oil Companies did not prevail on a claim "under Section 42.25 or 42.26," attorney's fees were not authorized by Section 42.29. If the legislature had intended for attorney's fees to be recoverable in a case of this type, it could have included in its Section 42.29 authorization of attorney's fees an appeal challenging the inclusion of the property on the appraisal roll, the determination of ownership, or the denial of an exemption. The legislature specifically authorized such protests in TEX. TAX CODE ANN. § 41.41(a) (Vernon 2008) (listing nine distinct actions that may be protested by taxpayer, including: excessive value, unequal appraisal, denial of an exemption,

ownership, and inclusion on tax roll). The legislature, however, did not authorize attorney's fees for all such protests. Section 42.29 authorizes attorney's fees for only two distinct types of protest: excessive value and unequal appraisal. *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.*, 835 S.W.2d 75, 77-79 (Tex. 1992). The Oil Companies' protest cannot be categorized as falling within either of those two. *See id.* The Oil Companies' first issue is overruled.

In the second issue, the Oil Companies assert that MCAD waived any complaint it had to the award of attorney's fees by requesting findings of fact that supported an award of attorney's fees. We disagree. MCAD repeatedly objected to issues related to the prospective award of attorney's fees, and MCAD did not request any findings of fact that would entitle the Oil Companies to attorney's fees or waive MCAD's objection to such fees. MCAD merely requested that the trial court amend its findings regarding attorney's fees to omit the phrase "recoverable under Tax Code § 42.29." The requested amendments reflected MCAD's continued objection to the award of attorney's fees and continued contention that the fees were not "recoverable." Moreover, MCAD did not ask the trial court to amend Conclusion of Law No. 9, wherein the trial court concluded: "The Oil Companies are not entitled to attorney's fees under Tax Code § 42.29." MCAD did not waive its complaint to the award of attorney's fees. The Oil Companies' second issue is overruled.

## V. *Conclusion*

The judgment of the trial court is affirmed.


JIM R. WRIGHT
CHIEF JUSTICE

March 26, 2009

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

12