Opinion issued January 13, 2015



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00264-CV

———————————

## ETC MARKETING, LTD., Appellant

## V.

## HARRIS COUNTY APPRAISAL DISTRICT, Appellee

On Appeal from the 127th District Court
Harris County, Texas
Trial Court Case No. 2010-71360

## DISSENTING OPINION ON REHEARING

This case addresses a county appraisal district's right to impose ad valorem taxes on "working" gas in interstate commerce that is temporarily stored in a storage facility in the county. The majority opinion extends the county's ad

valorem taxing power to this gas in contravention of both United States Supreme Court and Texas authority. Therefore, I respectfully dissent.

Appellant ETC Marketing, Ltd. ("ETC"), a marketer of natural gas, protested the appraisal and ad valorem taxation by appellee Harris County Appraisal District ("HCAD") of the portion of the working gas temporarily stored in Houston Pipeline Company, LP's Bammel facility in Harris County, Texas, and awaiting resale in the interstate market that was allotted to ETC. The majority affirms the trial court's order denying ETC's motion for summary judgment and granting HCAD's competing motion, thus upholding the tax. Because I believe the tax places an unconstitutional burden on interstate commerce, I would reverse and render judgment declaring that the ad valorem tax imposed on ETC's portion of the working gas stored in the Harris County facility by HCAD is unconstitutional. I withdraw the prior dissenting opinion dated October 2, 2014, and issue this dissenting opinion in its stead.

**Background**

The facts material to the analysis are restated below for ease of reference.

As the majority acknowledges, ETC buys, markets, and resells natural gas that it acquires from multiple sellers, principally from the "Katy Hub," a central delivery and distribution point for natural gas into and out of the state of Texas. All of the gas ETC buys for resale is "working gas," or gas that is intended for

2

ultimate delivery through the pipeline system to other buyers and end users. The gas ETC buys is entrusted to its affiliate, Houston Pipeline Company, LP ("HPL"), either for immediate transportation to a buyer or user through HPL's pipeline or for storage at HPL's Bammel facility, located in Harris County, for later transportation into the interstate pipeline system. There ETC either sells the gas or causes it to be further transported by the pipelines to ETC's requested redelivery points in Texas and out of state. Both ETC and HPL conduct business and maintain offices in multiple locations throughout Texas. Both entities have offices and employees in Houston and Dallas. HPL operates solely in Texas, but its pipelines connect with interstate pipelines.

HPL transports gas into the interstate pipelines both for ETC and for others as permitted by Federal Energy Regulatory Commission ("FERC") regulations. Gas owned by ETC and by the other marketers is physically commingled in the pipeline system for withdrawal for later delivery to purchasers or users as working gas. Thus, within the Bammel reservoir, any gas destined for sale in Texas is physically commingled with gas destined for sale in interstate commerce. HPL directs the physical movement of the gas; and, once ETC entrusts the gas it buys to HPL, ETC has no control over the storage or movement of the gas.

HPL's Bammel facility is not the only natural gas storage facility between the place where ETC purchases the gas and the burner tips where it is ultimately

3

consumed. HPL's pipeline system connects with multiple downstream pipelines and systems that, in turn, utilize other storage facilities in other states to facilitate the movement of the gas in the same way it utilizes the Bammel facility. Storage facilities such as the Bammel reservoir are located throughout the entire nationwide natural gas distribution system and are necessary for the efficient movement of the gas, facilitating regulation of pipeline capacities so that sufficient gas supplies can be provided to downstream users during peak demand periods. FERC recognizes such storage as a component of the transportation of natural gas.

The gas moves constantly throughout the pipeline system, and sellers, such as ETC, who have delivered gas into the system at one point, have the right to sell a corresponding volume of gas at another point in the system, subject only to FERC regulations governing the gas and HPL's handling of it. Distinct volumes of gas are segregated by paper allocation, which is used for verifying compliance with contracts and pipeline requirements, reporting to the Texas Railroad Commission, and payment of tariffs. ETC then sells the gas at "paper points" at various places along the interstate pipeline systems with which HPL may connect. The point of sale does not necessarily correspond to a physical location associated with any particular seller's natural gas.

**Analysis**

As the majority states, to prevail on appeal, ETC must demonstrate both that the natural gas taxed by HCAD was in interstate commerce and, if so, that the gas was not subject to ad valorem taxation by HCAD under the *Complete Auto* test.[1] The majority declines to determine whether the gas was in interstate commerce on the ground that the gas is subject to ad valorem taxation by HCAD regardless of whether it was in interstate commerce. Slip Op. at 7. I would hold that the storage of gas in the Bammel facility is an integral part of the interstate delivery of gas regulated by FERC and that the ad valorem tax fails the *Complete Auto* test that justifies the taxation of tangible property in interstate commerce. I would reverse and render judgment declaring the tax unconstitutional.

**A. Law Governing the Taxation of Tangible Personal Property**

The Texas Constitution provides that "[a]ll . . . tangible personal property in this State, unless exempt as required or permitted by this Constitution . . . shall be taxed in proportion to its value, which shall be ascertained as may be provided by law." TEX. CONST. art. VIII, § 1. Under the Texas Tax Code, unless exempt by law, tangible personal property is taxable if it is located in the taxing unit "for longer than a temporary period." TEX. TAX CODE ANN. § 11.01 (West 2008); *see also id*. § 21.02(a)(1) (West Supp. 2014) ("[T]angible personal property is taxable

---

[1] *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S. Ct. 1076 (1977).

5

by a taxing unit if it is located in the unit on January 1 for more than a temporary period."). But "[p]roperty exempt from ad valorem taxation by federal law is exempt from taxation." TEX. TAX CODE ANN. § 11.12 (West 2008).

The Interstate Commerce Clause of the United States Constitution grants Congress the power to regulate interstate commerce. *See* U.S. CONST. art. I, § 8, cl. 3. The United States Supreme Court has long interpreted the Commerce Clause to include a "dormant" Commerce Clause, which prohibits a state from imposing discriminatory burdens on interstate commerce. *Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433, 125 S. Ct. 2419, 2422–23 (2005); *see In re Nestle USA, Inc.*, 387 S.W.3d 610, 624–25 (Tex. 2012) (orig. proceeding). "[A] tax imposed on local activity related to interstate commerce is valid if, and only if, the local activity is not such an integral part of the interstate process, the flow of commerce, that it cannot realistically be separated from it." *Mich.-Wis. Pipe Line Co. v. Calvert*, 347 U.S. 157, 166, 74 S. Ct. 396, 401 (1954) (holding unconstitutional Texas occupation tax on taking gas from outlet of independent gasoline plant in state, after production, gathering, and processing, for immediate interstate transmission). "'The very purpose of the Commerce Clause was to create an area of free trade among the several States. That clause vested the power of taxing a transaction forming an unbroken process of interstate commerce in the

6

Congress, not in the States.'" *Id.* at 170, 74 S. Ct. at 403 (quoting *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330–31, 64 S. Ct. 1023, 1026 (1944)).

The burden is on the taxpayer to prove that a tax is invalid under the Dormant Commerce Clause by showing that the tax fails at least one prong of the *Complete Auto* test. *See Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 310–11, 114 S. Ct. 2268, 2276 (1994); *Midland Cent. Appraisal Dist. v. BP Am. Prod. Co.*, 282 S.W.3d 215, 223 (Tex. App.—Eastland 2009, pet. denied). Under the *Complete Auto* standard, a state tax on interstate commerce ordinarily "will not survive Commerce Clause scrutiny if the taxpayer demonstrates that the tax (1) applies to an activity lacking a substantial nexus to the taxing State; (2) is not fairly apportioned; (3) discriminates against interstate commerce; *or* (4) is not fairly related to the services provided by the State." *Barclays Bank*, 512 U.S. at 310–11, 114 S. Ct. at 2276 (emphasis in original) (citing *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 1079 (1977)). A state tax must, therefore, fail only one prong of the *Complete Auto* test to be unconstitutional.

**B. Application of the Interstate Commerce Clause to the Storage of Natural Gas**

The majority finds it unnecessary to determine whether ETC's gas is in interstate commerce, reasoning that, even if it is, the tax is constitutional. Thus, for purposes of its argument, it simply assumes that the gas is in interstate commerce,

7

and it addresses the facts of the case solely in the context of determining whether the *Complete Auto* test is satisfied.  *See* Slip Op. at 11–22.

The majority first recites the facts it finds material to its determination as to whether the gas has a "substantial nexus" with Texas, the taxing state, and therefore satisfies the first factor used under the *Complete Auto* test.  Slip Op. at 11–16.  It observes that ETC has offices and employees in Harris County and elsewhere in Texas; that the gas at issue was purchased by ETC at the Katy Hub in Harris County; that HPL, which has offices and employees in Texas and whose entire system, including the Bammel facility, is located within Texas, transported the gas; and that ETC's natural gas is stored for up to several months in the Bammel facility "pursuant to a storage agreement with [HPL]."  Slip Op. at 11–12.

The majority opines that "[t]hese factors establish that ETC Marketing ha[s] a substantial physical presence in Harris County" and that these facts distinguish this case from a case that ETC relies upon, *Peoples Gas, Light, & Coke Co. v. Harrison Cent. Appraisal Dist.*, 270 S.W.3d 208 (Tex. App.—Texarkana 2008, pet. denied).  Slip Op. at 12.  The majority reasons that, "unlike this case, Peoples Gas had no physical facilities, employees, representatives, or customers in Texas," whereas "ETC Marketing had a physical presence in Harris County including employees, offices, and—most significantly—natural gas that it had specifically contracted to store with [HPL]."  Slip Op. at 12.  It points out, "Unlike the pipeline

8

at issue in *Peoples Gas*, [HPL's] facilities are located entirely within Texas, including the Bammel reservoir in Harris County." Slip Op. at 12–13. The majority also points out that Peoples' "only connection to Texas was through the 'structure and location' of the separately owned pipeline, which made the decision about where to store the gas and paid its own ad valorem taxes on the facility and equipment used for storage of natural gas in Texas." Slip Op. at 12.

Unlike the majority, I would first determine whether the portion of the working gas owned by ETC that is temporarily stored in the Bammel facility is indeed in interstate commerce under the facts of the case; and, if it is, I would apply the *Complete Auto* test to determine the constitutionality of the ad valorem tax imposed by HCAD on that gas. Therefore, rather than beginning with the first *Complete Auto* factor, I would perform the same analysis as the *Peoples* court— first determining whether the working gas owned by ETC is property in interstate commerce and, if so, determining whether it is nevertheless subject to the ad valorem tax imposed by HCAD. When the analysis is performed this way, it is clear to me that the distinctions the majority draws between this case on the one hand—in which a county appraisal district imposed an ad valorem tax on the amount of working gas owned by the taxpayer that was in temporary storage in a Texas county in a gas storage facility connected to the interstate pipeline system— and the *Peoples* case on the other hand—in which a different Texas county

appraisal district did the same thing—are immaterial to the analysis of the constitutionality or unconstitutionality of the tax. Finding no material distinction between this case and the *Peoples* case, I would reach the same result as the Texarkana Court of Appeals in *Peoples*. I would hold that the gas is in interstate commerce and that the HCAD tax is unconstitutional.

ETC is a marketing company that buys gas committed to the interstate natural gas pipeline system, some of which is stored by HPL, the pipeline owner, at the Bammel facility in Harris County until a specified quantity is resold and delivered by ETC to a customer at a paper point along the interstate pipeline system, subject to regulations promulgated by FERC. Peoples was similarly "a distribution company that purchase[d] natural gas from suppliers and deliver[ed] it to users in Chicago, Illinois" through an interstate pipeline system operated by Natural Gas Pipeline Company of America ("the Pipeline"). *Peoples*, 270 S.W.3d at 211. Like ETC, Peoples bought and sold natural gas in the interstate pipeline system owned and operated by the Pipeline. *Id.* Some of the gas distributed by Peoples was stored at the North Lansing facility, a natural gas storage facility in a large depleted natural gas field in Harrison County, Texas, similar to the Bammel facility located in Harris County. *Id.* The Pipeline, however, had many associated storage facilities for gas in the pipeline, which were owned and operated "in the aggregate." *Id.* In *Peoples*, Harrison County attempted to place an ad valorem tax

on a portion of the working gas in the Harrison County storage facility that it had allocated to Peoples based on the Pipeline's records of Peoples' working natural gas balance at the facility at the end of the year. *See id.* at 211–12. Here, HCAD has done the same thing with respect to a Harris County storage facility.

In short, Harrison County attempted to do *exactly* what Harris County has done in this case under the same material circumstances, the only differences being that ETC has offices in Texas, whereas Peoples did not, and that HPL, which operates the Bammel facility and stores gas there, including gas allocated to ETC, operates an intrastate Texas pipeline system connected to the interstate pipeline system, whereas the Pipeline into which Peoples delivered its gas stored at the North Lansing facility was itself an interstate pipeline system. The Texarkana Court of Appeals, however, struck down the ad valorem tax, unlike the majority in this case. The majority here upholds the tax on the ground that ETC has a physical presence in Texas, whereas Peoples did not, and ETC's gas stored at the Bammel facility moves into the pipeline system of HPL, a Texas pipeline, to the points of sale and consumption along the interstate pipeline system to which HPL connects, whereas Peoples' gas moved directly into an interstate pipeline operated by the Pipeline. Slip Op. at 12–13. These distinctions are, in my view, distinctions without a difference in any way material to this case.

11

The *Peoples* court's reasoning is instructive. The court first pointed out that the natural gas transportation and storage industry was restructured by FERC in 1992, creating "a system of commercial rights for the pipeline customer that was separate from the physical operation of the pipeline system" in which gas is bought and sold at "paper points," or imaginary points along the pipeline "that do not necessarily reflect the physical location of the gas purchased." *Peoples*, 270 S.W.3d at 213. In this nationwide gas transportation system—the same as that in this case—the system operator, here HPL, retains complete control of the physical operation of the pipeline and decides when and where the natural gas is stored, and there is no physical connection between a pipeline customer's storage account balance and physical volumes at any particular storage facility. *See id.*

The *Peoples* court reasoned that although the Pipeline had full custody, control, and possession of the gas in the pipeline system it had no ownership rights over it. *Id.* at 213–14. Rather, for ad valorem tax purposes, Peoples was the owner of its allotted portion of the natural gas stored at the Pipeline's North Lansing facility in Harrison County. *Id.* at 214. However, the court held that the Commerce Clause shielded Peoples from the county appraisal district's ad valorem tax assessment because the gas was in interstate commerce and the tax did not pass the *Complete Auto* test that would nevertheless allow it to be assessed. *See id.* at 215–19.

Stating that "[t]he crucial question in determining whether the state may exert its taxing power is whether there is 'continuity of transit,'" the *Peoples* court looked first to see whether there was such continuity. *Id.* at 215–16 (quoting *Indep. Warehouses v. Scheele*, 331 U.S. 70, 73, 67 S. Ct. 1062, 1064–65 (1947) (stating, "If the interstate movement has begun, it may be regarded as continuing, so as to maintain the immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement. . . . Formalities, such as the forms of billing, and mere changes in the method of transportation, do not affect the continuity of the transit")). The *Peoples* court opined that because "Peoples has no control over where [its] natural gas is stored and how much is stored at any given location, we cannot say that Peoples made the decision to store gas at North Lansing in order to serve its business purpose." *Id.* at 216. Consequently, it concluded that "the stoppage of natural gas in North Lansing does not serve the business purpose of Peoples." *Id.* at 217. Rather, it served the business purpose of the Pipeline. *See id.* The court determined that the storage of natural gas at the North Lansing facility did not take the gas out of interstate commerce, which "it entered by injection into an interstate pipeline," because "[t]o conclude otherwise would be to segregate, from the pipeline itself, a function deemed 'necessary and

13

integral' to the pipeline," namely the function of storing working gas in the system for delivery to points of resale and consumption in interstate commerce. *Id.*

Here, by contrast, the majority declines to determine whether the working gas stored at the Bammel facility was in interstate commerce, but states that it assumes it was. Slip Op. at 10–11. However, it implicitly, and contradictorily, concludes that the portion of the working gas allotted to ETC was *not* in interstate commerce, stating, "There was no evidence that the gas was already bound for another state when it was committed to [HPL]," and, "[T]here was evidence that ETC Marketing contracted to store the gas in [HPL's] facilities, located entirely within Texas, for its own business purposes . . . ." Slip Op. at 13. This is the opposite of the *Peoples* court's conclusions that the working gas in the pipeline was in interstate commerce from the moment it was injected into the pipeline system and that the storage was an integral part of the Pipeline's business purpose of interstate gas transportation and could not realistically be separated from it. *See Peoples*, 270 S.W.3d at 217. I agree with the reasoning of the *Peoples* court, which is supported by Supreme Court case law. *See Mich.-Wis. Pipe Line Co.*, 347 U.S. at 166, 74 S. Ct at 401 (stating that tax of local activity related to interstate commerce is valid only if it is not such an integral part of interstate process of flow of commerce that it cannot realistically be separated from it).

14

In reaching the opposite conclusion from the *Peoples* court, the majority places great emphasis on ETC's business purpose in storing the gas at the Bammel facility so it could "tim[e] the market and sell[] the gas at higher prices out of state during cold months" and the lack of evidence of specific sales of the stored gas into the interstate market. Slip Op. at 13. I agree with the majority that ETC has as a business purpose the storage of a portion of its gas in interstate commerce until the price rises with demand and that it contracted with HPL (as Peoples contracted with the Pipeline) to use a portion of the Bammel facility to store some of its gas for this purpose. However, it does not follow that this business purpose took the gas out of interstate commerce or justified burdening the portion of ETC's gas allocated to the Bammel facility with a local ad valorem tax in Harris County. Storage of a portion of the gas until needed served the business purposes of both ETC and HPL, but storage of a portion of ETC's gas at the Bammel facility was only incidental to the overriding purpose served by the agreement between ETC and HPL: the efficient transportation and sale of natural gas throughout the interstate pipeline system in order to meet the need for gas as and wherever the need might arise, a function "necessary and integral" to the operation of the FERC-regulated nationwide gas distribution system. *See Peoples*, 270 S.W.3d at 217.

I would hold that the working gas owned by ETC on which HCAD imposed the contested ad valorem tax was in interstate commerce when it was temporarily

15

stored in the Bammel facility, and I would then apply the *Complete Auto* test to determine whether the ad valorem tax imposed by HCAD on that gas placed an unconstitutional burden on interstate commerce.

**C.  The *Complete Auto* Test for Constitutional Taxation of Property in Interstate Commerce**

### 1.  *Substantial nexus to the taxing state*

I agree with the majority that the validity of the tax imposed by HCAD on the portion of ETC's gas stored at the Bammel facility must be determined under the *Complete Auto* test.  *See* 430 U.S. at 279, 97 S. Ct. at 1079.  The first prong of that test, upon which the majority concentrates, considers whether the tax applies to an activity that has a substantial nexus with the taxing state.  *See id.*; Slip Op. at 11–16.  Again, the majority distinguishes *Peoples*, which I find to be both materially indistinguishable and instructive.

The Texarkana Court of Appeals observed that Peoples maintained no office in Texas and had no employees, representatives, or physical facilities in Texas and that there was no evidence that any of the gas it purchased was delivered in Texas, although the record suggested that much of the stored gas was produced in Texas. *Peoples*, 270 S.W.3d at 218–19.  The court found this to be an "insufficient nexus between Texas and the entity, property, or transaction to be taxed" to justify the tax under the *Complete Auto* test.  *Id.* at 219.  Therefore, it held that the tax violated the Commerce Clause.  *See id.*

16

The majority in this case, viewing those facts as determinative of the "substantial nexus" factor, concludes that ETC's own physical presence in Harris County and its contract with HPL for temporary working gas storage at the Bammel facility distinguish this case from *Peoples* and also from *Midland Central Appraisal District v. BP America Production Co*. Slip Op. at 12–14. I have already opined that I find this case indistinguishable from *Peoples*. I draw the same conclusion with respect to *BP America*.

In *BP America*, the Eastland Court of Appeals, similarly to the Texarkana Court of Appeals in *Peoples*, held that an ad valorem tax was improperly assessed by a Texas county on oil in interstate commerce passing through an interstate pipeline but temporarily held in a tank farm located in Texas. *See* 282 S.W.3d at 219, 223–24. The majority in this case, however, distinguishes oil in interstate commerce that is temporarily stored in Texas from working gas that is similarly temporarily stored. It opines, "Unlike ETC Marketing's natural gas deliberately stored at Bammel to facilitate timing the natural gas market, the oil at issue in the *Midland* case was not held in the tank farm for storage purposes or for any business purpose of the owner other than its transmission through the pipeline." Slip Op. at 14 (citing *BP Am. Prod. Co.*, 282 S.W.3d at 221–23). The problem with this argument is that every seller of oil or gas in an interstate pipeline system that is destined for resale on an interstate market necessarily has the business

purpose of making money on the resale. Further, this fact is immaterial to the overriding purpose of holding either oil or gas in a temporary storage facility to further its efficient transportation and sale throughout the interstate pipeline system.

I find the *Peoples* and *BP America* decisions to be not only indistinguishable from this case on the law and material facts but also persuasive authority in deciding the constitutionality of the tax imposed in this case.

In assessing the validity of the tax on the oil stored in Midland County under the first prong of the *Complete Auto* test, the Eastland Court of Appeals opined in *BP America*:

> To comply with the first prong of the *Complete Auto* test, the ad valorem tax on the oil in the tank farm must have applied to an activity with a substantial nexus with Texas. Although the oil itself had a substantial nexus with this state as much of it was produced in this state and some of it was destined for an in-state refinery, the "activity" being taxed had no such nexus. The activity essentially being taxed in this case was the ownership of oil that was present but in transit on January 1 in a tank farm that constituted an integral part of an interstate, common carrier pipeline system.

282 S.W.3d at 224. Likewise, the activity that is being taxed in this case is the ownership of natural gas that was present but in transit in a natural gas storage facility that constituted an integral part of an interstate, common carrier pipeline system into which the gas was transmitted for resale and consumption in accordance with market forces, pipeline handling, and FERC regulations.

18

Unlike the majority, I would hold that the ad valorem tax imposed by Harris County on the gas owned by ETC and stored in the Bammel facility does not satisfy the substantial nexus test, the first prong of the *Complete Auto* test for constitutionality under the Commerce Clause, and is therefore unconstitutional. This conclusion becomes even more compelling when the other prongs of that test are considered.

### 2. *Discrimination against interstate commerce*

The *Complete Auto* test also asks whether the tax discriminates against interstate commerce. *See* 430 U.S. at 279, 97 S. Ct. at 1079. A tax is nondiscriminatory under *Complete Auto* when it "places no greater burden upon interstate commerce than the state places upon competing intrastate commerce of like character." *Id*. at 282, 97 S. Ct. at 1081. The United States Supreme Court elaborated upon this test in *American Trucking Associations*. *See* 545 U.S. at 433–38, 125 S. Ct. at 2423–26 (upholding flat tax imposed on truckers exclusively for intrastate activities). The Court observed that it had found unconstitutional state regulations and taxes that (1) "unjustifiably discriminate on their face against out-of-state entities"; (2) "impose burdens on interstate trade that are 'clearly excessive in relation to the putative local benefits'"; (3) "facially discriminate against interstate business and offer commercial advantage to local enterprises"; (4) "improperly apportion state assessments on transactions with out-of-state

19

components"; and (5) "have the 'inevitable effect [of] threaten[ing] the free movement of commerce by placing a financial barrier around the State.'" *Id.* at 433, 125 S. Ct. at 2423 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 847 (1970) and *Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 284, 107 S. Ct. 2829, 2840 (1987)).

The majority concludes that "the ad valorem taxes here were nondiscriminatory." Slip Op. at 19.

I would hold that the tax imposed by HCAD on ETC's gas stored in the Bammel facility in Harris County is discriminatory against interstate commerce on two of the grounds recognized by the United States Supreme Court in *American Trucking Associations*. First, it imposes a burden on working gas in interstate trade that is "clearly excessive in relation to the putative local benefits" in that the local benefits of storage in the Bammel facility are not necessary to the efficient distribution of the gas, which could be stored by HPL and others elsewhere but is stored in Harris County at HPL's discretion. And the local benefits of fire and police protection afforded to the Bammel facility by its location in Harris County primarily benefit HPL and are taxed to it, as argued below with respect to the fourth prong of the *Complete Auto* test. Thus, the benefits to ETC of temporarily storing a portion of its working gas at the Bammel facility are clearly outweighed by the burden of paying an ad valorem tax for use of that facility.

20

Second, the tax has "the 'inevitable effect [of] threaten[ing] the free movement of commerce by placing a financial barrier around the [s]tate'" by imposing a tax on gas temporarily stored in Harris County that is not levied by taxing authorities in other taxing jurisdictions through which the gas passes and in which it is temporarily stored. *See Am. Trucking Ass'ns*, 545 U.S. at 433, 125 S. Ct. at 2423. In this case, the tax the majority upholds is particularly discriminatory in that it places a financial barrier around Harris County in the form of an ad valorem tax that two other Texas courts of appeals have invalidated as unconstitutional on facts materially indistinguishable from those in this case.

I would hold that the ad valorem tax imposed by HCAD on ETC's gas stored in the Bammel facility is discriminatory against interstate trade and is therefore unconstitutional under the third prong of *Complete Auto*.

### 3. *Fair relation to state-provided services*

The final prong of the *Complete Auto* test is whether the tax is fairly related to the services provided by the state. *See* 430 U.S. at 279, 97 S. Ct. at 1079. The "fair relation prong of *Complete Auto* requires no detailed accounting of the services provided to the taxpayer on account of the activity being taxed, nor, indeed, is a State limited to offsetting the public costs created by the taxed activity." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 199, 115 S. Ct. 1331, 1345 (1995). Rather, "police and fire protection, along with the usual and

21

usually forgotten advantages conferred by the State's maintenance of a civilized society, are justifications enough for the imposition of a tax." *Id.* at 200, 115 S. Ct. at 1346.

Taking at face value the statement of the law by the Supreme Court in *Oklahoma Tax Commission*, the majority reasons that "[ETC] owns the gas while it is stored at Bammel, and it enjoys the benefit of public services which facilitate gas storage, which in turn allows it to accomplish its business objective of buying natural gas and holding it for sale at some later point in time." Slip Op. at 21. Therefore, it concludes that "the tax in this case is fairly related to the services provided by the state." Slip Op. at 21 (citing *Complete Auto*, 430 U.S. at 279, 97 S. Ct. at 1079).

Again, I disagree with the majority's reasoning and, instead, find the reasoning and the conclusion of the *Peoples* court on this fourth prong of the *Complete Auto* test to be persuasive. In that case, the Texarkana Court of Appeals, having found the ad valorem tax imposed by Harrison County on Peoples' gas stored in the North Lansing facility to be unconstitutional under the "substantial nexus" test of the first prong of the *Complete Auto* test, turned directly to the fourth prong. It reasoned:

> Under the Commerce Clause, the measure of the tax must be reasonably related to the extent of the taxpayer's presence or activities within the taxing state and to the taxpayer's consequent enjoyment of the opportunities which the state has afforded. Even though fire and

> police services may not be invoked, protection conferred by these "along with the usual and usually forgotten advantages conferred by the state's maintenance of a civilized society are justification enough for the imposition of a tax." The District presented substantial evidence of services provided within the county. While we do not doubt the value of those services, we note, again, that services such as law enforcement and the fire department would serve the North Lansing facility itself, and the facility undoubtedly belongs to Pipeline, which does pay ad valorem taxes on both the "cushion" gas it maintains in the facility and the physical plant of the facility itself.

*Peoples*, 270 S.W.3d at 219 (internal citations omitted). The court held that the tax imposed by Harrison County on Peoples' gas in storage at the North Lansing facility failed the fourth prong of the *Complete Auto* test as well as the first. *Id.*

Here, as in *Peoples*, the record shows that HPL pays millions of dollars in property taxes on the Bammel facility and on its cushion gas maintained at the facility, just as the Pipeline in *Peoples* paid ad valorem taxes on its cushion gas and the physical plant of the Harrison County facility.[2] I, therefore, agree with the *Peoples* court's reasoning with regard to the fourth prong of the *Complete Auto* test. I would conclude, like that court, that while law enforcement, fire, and other public services provided by Harris County to the Bammel facility are valuable services, those services serve the *facility* itself, on which HPL pays substantial taxes, in addition to paying taxes on the cushion gas it maintains permanently at the facility. These taxes are not properly levied against the *activity* of temporarily

---

[2] "Cushion gas" is gas that remains in the storage facility and is used to maintain adequate pressure to keep the working gas at issue in this case moving through the pipeline system.

23

storing gas owned by marketers during its transmission through the interstate pipeline system or the *use* of the facility for that purpose.

I would conclude that the ad valorem tax imposed on ETC's gas at the Bammel facility fails the fourth prong of the *Complete Auto* test, in addition to the first and third prongs.

Because I would conclude that the portion of the working gas stored at the Bammel facility that is allotted to ETC is in interstate commerce and that the ad valorem tax imposed on that gas by HCAD impermissibly burdens interstate commerce, as shown by the tax's failure to satisfy three of the *Complete Auto* test factors, I would hold that the tax violates the Commerce Clause of the United States Constitution.

## Conclusion

I would reverse the judgment of the trial court and render judgment declaring that the ad valorem tax imposed by HCAD on working gas allotted to ETC that is temporarily stored in the Bammel facility in Harris County is unconstitutional.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, dissenting.